OPINION OF THE COURT
Frank S. Rossetti, J.
This claim is for damages arising from a vicious assault on *715 claimant by a "juvenile delinquent” who was temporarily released from a State Division for Youth facility.[1] The assault was particularly heinous, involving not only the punching and stabbing of the then 58-year-old claimant, but also multiple rape and threats to kill, all over a two-hour period. Claimant contends defendant’s release of the assailant was negligent and in violation of statute. The State defends that the release was an immune quasi-judicial governmental function and that inadequate supervision and proximate cause were not shqwn. Considering the record in its entirety, we find that the facts and the law support claimant’s position.
In making these findings, the court is cognizant of the relative rarity of liability where released or discharged inmates of State institutions are involved. In fact, as best as can be determined by the court’s research, this is a first instance case insofar as State liability to third parties injured by temporarily released or discharged juvenile delinquents is concerned. In any event, we believe the result here is supported by applicable law, notwithstanding the "sometimes blurred * * * distinctions” traditionally employed in the area of government liability and immunity. (Pratt v Robinson, 39 NY2d 554, 563.) Indeed, the uncertainty arising from said "distinctions” as to what governmental activities are or should be immune calls for at least judicial if not legislative clarification, particularly in these times when said activities are expanding and impinging more extensively on the lives of private citizens. Hopefully, a more clear-cut understanding by the State of its legal responsibilities would aid in the reduction of deplorable incidents such as the one at bar.
At the time of the subject assault, the assailant (Joseph "Booster” Johnson) was within three weeks of his 16th birthday. The limited record adduced at trial[2] indicated that before coming to New York, Johnson had been arrested in Detroit, Michigan (in June, 1974) for attempted robbery and stealing. He was 13 years old then and was placed on probation. During Easter of 1975, Joseph’s parents took him to New York City on a visit to his older, single sister. However, when his parents returned to Detroit, he remained behind and ended up *716 staying with his sister at her apartment in Queens. She was only six years older than Johnson, just out of her teens and apparently working at the time. On the instant record it is unclear why Joseph’s parents chose to abandon their 14-year-old son, but that in fact is what they did.
At any rate, Johnson was shortly arrested three separate times within one month. On May 14, 1975 he was arrested for possession of stolen property, on June 9, 1975 for robbery and forcible rape[3] and only four days later for possession of a weapon (a knife). On September 3, 1975 there was another charge for possession of a weapon, but by this time there had apparently been some court proceedings (the records indicate in Queens Family Court) since on September 19, 1975 Johnson was admitted to the State’s Warwick School for Boys.
Unfortunately, this "placement” did not ameliorate Johnson’s propensity for crime, violent or otherwise. His sister testified that after his Warwick placement, he visited her six or seven times on temporary release passes. She stated she always had problems with him and indicated he generally did not obey her. The record of his continued criminal acts during this period (all or the majority of which occurred in the course of his visits to his sister) was terse testimony to her lack of control over him. Such is evidenced by the following sequence of events, each apparently occurring after Johnson was temporarily released from Warwick.
On January 15, 1976, at the end of a Christmas visit, Johnson was arrested for attempted first degree robbery. On March 8, 1976 he was arrested for first degree robbery and less than one week later (on March 14) for attempted robbery, possession of drugs and assault on a police officer. On June 14, 1976 he was arrested for third degree burglary, petit larceny, criminal trespass, possession of stolen property, criminal mischief and attempted burglary. On September 27, 1976, Johnson did not return from a visit and he was declared AWOL, thereby calling forth a warrant for his arrest.
After adding another charge to his record, third degree possession of stolen property (on November 11, 1976), Johnson was returned to Warwick on November 19, 1976, but that facility was being closed. He was therefore transferred to the Division for Youth Austin MacCormick Youth Center, the *717 State facility Johnson was released from the day he assaulted claimant. MacCormick was a nonsecure facility while Warwick had both secure and nonsecure areas. It is also observed that while at Warwick, Johnson refused to work, "came in high” and allegedly stole a watch.
The State’s records, such as they are (see n 2, p 715), disclose that Johnson was initially passive at MacCormick, but he soon started extorting money from other, weaker residents through a process of "methodical intimidation”. During the Christmas season of 1976, MacCormick attempted to arrange for a visit with his sister, but such could not be accomplished, chiefly because Johnson’s sister did not want to be responsible for him. She was then working full time during the day, taking two courses at night school and in the busy process of getting married. More significantly, the social worker who had the most contact with Johnson up to that time (while he was in both Warwick and MacCormick) "strongly recommend[ed]” (her emphasis) that Johnson remain at the facility. This worker noted that when he "was sent to a Urban Residence last Christmas * * * he was arrested for robbery and more cases after that.” She concluded there "seem to be no problems in a facility, it’s when he is in the community.” (Emphasis supplied.)
The said records note that after the other residents returned from their 1976 Christmas visits, Johnson became angry and bitter, primarily because he had been denied any such privilege. Soon thereafter he was involved in an assault on one of the residents and apparently continued his pastime of extortion by intimidation of weaker residents. Nonetheless, because Johnson met certain time and performance standards for a pass (i.e., he had been at MacCormick for two months and had performed adequately in work, school and other areas) and because it was believed he would be difficult to deal with if he did not get one, on February 9, 1977 he was released on a five-day pass to his sister in Queens. She was married by then and, together with her husband, worked full time. The pass was given despite the opposition of both the aforesaid social worker and the sister. The latter acceded to accepting a visit only after she was called personally by the MacCormick camp counselor who wanted the release. Johnson’s sister testified she initially resisted the counselor’s imprecations, but then agreed because he "made me feel bad about it.”
*718 In any event, at about 9:00 a.m. on the day of the subject assault, Johnson was taken to Ithaca and put on a bus bound for New York City. There is no indication in the record of any arrangements being made for him to be met at the New York City bus terminal, despite the fact that to get to his sister’s residence he would have to go from the heart of Manhattan to an outermost part of Queens almost 15 miles away.
Upon reaching Manhattan, the obvious happened. When the bus arrived at the terminal sometime after 1:00 p.m., Johnson apparently wandered uptown to a building on West 56th Street where claimant lived. At about 2:00 p.m., upon finding Mrs. Robilotto alone in the building’s laundry room, he entered and closed the door behind him. He had a knife and demanded money. When claimant told him she had none, he punched her in the head, commanded her to undress and then stabbed her in the stomach. Incredibly, despite the bleeding stab wound, Mrs. Robilotto got undressed (as did Johnson) and was thereupon raped on the concrete floor of the laundry room. They then dressed and he took claimant at knifepoint upstairs to her apartment in the building. There she gave him money but he nevertheless threatened to kill her, and raped her three more times. Mrs. Robilotto was then tied up and threatened by Johnson that he or his friends would kill her if she went to the police. He then left and claimant was able to untie herself and get help. The details of Mrs. Robilotto’s injuries and subsequent treatment are discussed hereafter.
The statute governing Johnson’s temporary release on February 9, 1977 was section 523 of the Executive Law. It then provided, inter alla, as follows:
"§ 523. Release.
"1. The division may release from a school or center any child placed with the division whenever it deems such release to be in the best interest of the child and suitable care and supervision can be provided * * * The division may establish regulations in connection with such release.
"2. It shall be a condition of such release that the child so released shall continue to be the responsibility of the division for the period provided in the order of placement, notwithstanding his release therefrom, and that the division may cause such child to be returned to a school or center at any time within the period of placement.”[4]
*719 The State argues that analogous to the partial judicial immunity accorded Parole Board decisions (see Welch v State of New York, 74 AD2d 661; Executive Law, § 259-i, subd 5 [formerly Correction Law, § 212]), the instant temporary release provided no basis for State liability because done "according to law.” We disagree.
The key phrase in the statute under the circumstances here was "suitable supervision”. The State employee responsible for the release was a Senior Youth Division Counselor at MacCormick. He testified he received input from other staff members, as well as from the aforesaid social worker, but the decision to release was his, subject of course to his supervisor’s veto. The opposition of the social worker was known to the said State counselor and she recorded her objections as follows: "This worker is not in favor of this home visit. Every home visit Joseph has been involved in robberies. Supervision by his sister has been completely ignored.”
Despite this opposition, as well as that of Johnson’s sister, the counselor noted "some * * * indicators of some progress” and decided to "award” Joseph a visit for the two reasons mentioned above. (See p 717.) Yet, in the same notes made by this counselor justifying the release, he also reached the following conclusions:
"In summary, Joseph is, in the opinion of the counselor, a youngster who feels he has been abandoned by his family. He harbors deep-seated anger and hostility. He blames everyone for the emotional and physical deprivation he has suffered. And, he preys upon the weak and defenseless to satisfy his need for revenge.
"Joseph has a history of being violently aggressive and, although we have not witnessed it thus far, one can sense it and feel it about him. It is simply a matter of time and circumstances before it comes out.
"In all probability, Joseph is not a good candidate to succeed in this facility. He certainly can benefit from our program components of school, work and group and individual counseling, but we cannot provide the close supervision, tight structure and physical controls that are certainly going to be necessary to deal with him effectively”.
*720 At trial the counselor testified that in making his decision to release he gave no consideration to the community at large. He also testified there were no written regulations concerning release then in effect, the only "regulations” being those formulated by the personnel at MacCormick.
Giving the phrase "suitable supervision” a reasonable construction particularly in view of the State’s overriding and continuing responsibility during the release (see Executive Law, § 523, subd 2), we believe the consideration of Johnson’s dangerousness to third persons was legitimately included therein. The State was at least in a parens patriae relationship with this juvenile and as such was responsible for vicious acts of the "child” where it had notice of his propensities therefor (see p 716). Clearly there can be no doubt of the State’s knowledge of Johnson’s violent and criminal propensities. In the face of his record, the fact he had invariably been arrested or otherwise in trouble on all his prior visits and the fact the person who was to supervise him did not want and was unable to do so, we believe it a patent perversion of language to find that the State’s release here provided for suitable supervision. Depositing a youth with Johnson’s record a block away from the "sin strip” of one of the major crime capitals of the country, 15 miles from his supposed supervision, was arguably tantamount to providing no supervision at all, much less suitable supervision.
In the instant circumstances it is clear Johnson’s sister was unable to provide the required supervision, but the State employee releasing him seemingly gave no consideration thereto. His overriding concerns were the fact Johnson met certain minimum requirements and would be difficult to deal with if he was not "awarded” a visit.[5] The phrasing of the statute leaves doubt as to whether suitable supervision was an independent, objective requirement or one based on the rea *721 sonable good faith opinion of the State employee. (See Executive Law, § 523, subd 1.) If the former is correct, the State’s failure to act in accordance with law is self-evident and in the latter case we do not find the pathetic State arrangements here to have been reasonable, good faith compliance with the statute. Hence the subject release was not according to law and the State can claim no defense on that basis. In fact, the violation of statute which occurred supports liability against the State in negligence. (See, e.g., 41 NY Jur, Negligence, § 41.)
However, we believe a broader, more general argument can be made for State liability. While the above discussion was at least partially concerned with the State’s invocation of the noted Parole Board standard, this court has severe doubts as to the applicability of that standard to the instant temporary release. Said standard, and the concomitant immunity from review when the standard is met, are expressly set out in the relevant Parole Board statute (see Correction Law, former § 212) while the subject release statute contains no such provision. Additionally, we believe there is significant, quantum difference between a parole determination based on a hearing and other due process and judicial-like procedures on one hand and the unilateral and often routine granting of home visit passes on the other. Further, the State’s relationship to and responsibilities concerning adult prisoners are markedly disparate from its position and duty with respect to delinquent children. As buttressed by the general discussion of immunity hereafter, giving due recognition to the general rules of statutory construction (see McKinney’s Cons Laws of NY, Book 1, Statutes, § 74), we do not believe reliance on said standard is necessarily proper. Rather, we think more general principles can be applied, ones which call for the imposition of liability not merely because of the inapplicability of the immunity argued for by the State, but also because of the presence here of foreseeable harm resulting from breach of clear duty.
The most pertinent recent exposition of the law applicable is found in Santangelo v State of New York (103 Misc 2d 578). There a youthful offender was given a temporary release by a State correctional facility’s "Temporary Release Committee”. He thereafter committed a rape. Judge Lowery of this court held that the committee’s decisions did not enjoy absolute immunity and that the State would be liable for failure to *722 avoid foreseeable risks. However, under the facts there, the prior record of the assailant was found not to be such that violent, assaultive conduct by him was foreseeable. Nonetheless, this crucial factual distinction (to wit, the absence in Santangelo of any significant record of violations, criminal or otherwise, versus the almost unrelenting history of crimes of violence here) does not make those legal findings inapplicable to the case at bar. In both Santangelo and the instant matter there were no statutes conferring immunity, judicial or otherwise (cf. Correction Law, former § 212) and that court’s penultimate legal finding of potential State liability supports a finding of actual liability here.
 A preliminary yet essential element in said legal finding was Judge Lowery’s holding that the said committee and its decisions were not important enough to have an absolute immunity (see, also, Drake v State of New York, 97 Misc 2d 1015, 1022, n 3, affd sub nom. Madigan v State of New York, 73 AD2d 1031). The subject release, however, did not have the benefit of such a deliberative body. Rather, it was done by an ordinary State employee, not even a supervisor, and apparently it was part of his job he did relatively routinely (see, also, Kelly v State of New York, 57 AD2d 320, 328-332, affd 45 NY2d 973; Padula v State of New York, 59 AD2d 480, 482, revd on other grounds 48 NY2d 366, 368-369; cf. Weiss v Fote, 7 NY2d 579, 586).[6] Moreover, the release in Santangelo had the advantage of an extensive legislative scheme, as opposed to the single, brief statute here. (Compare Correction Law, art 26, with Executive Law, § 523.) We thus find immunity even less called for under the instant circumstances. Clearly defendant did not meet its burden with respect to its immunity defense. (See, e.g., Mink Hollow Dev. Corp. v State of New York, 87 Misc 2d 61, 65-66, and cases cited.)
*723 The further and crucial legal basis for potential State liability in Santangelo was its finding that a tort duty to avoid foreseeable risk arose from the defendant’s affirmative conduct in releasing a would-be assailant.[7] Such conduct, as well as the State’s parens patriae and/or loco parentis relationship to the assailant (see Linder v Bidner, 50 Misc 2d 320; cf. Wasserstein v State of New York, 32 AD2d 119, 120-121, affd 27 NY2d 627; Scochemaro v State of New York, 6 Misc 2d 543, 545), thus provide the legal basis for liability in this case, whether deemed grounded on a "special duty” (see, e.g., Drake v State of New York, supra, pp 1019-1022) or general tort principles applied to private individuals (see Poysa v State of New York, supra, pp 273-275; Court of Claims Act, § 8).
Finally, in contradistinction to the ultimate factual finding in Santangelo, we conclude that under the facts here the State’s conduct was negligent (particularly in view of the specific violation of statute — see p 721), under either a reasonable good faith standard for public servants (see Drake v City of Rochester, 96 Misc 2d 86, 98, 100, and cases cited; see, also, Santangelo v State of New York, supra, 103 Misc 2d at p 584)[8] or an ordinary reasonable prudent man negligence standard (see Simon v City of New York, 53 Misc 2d 622, 624). Clearly due care was not exercised as far as the statutorily required "suitable supervision” was concerned and we do not find sufficient evidence of a reasonable good faith attempt to comply with the specific requirements of the statute and the applicable general tort principles concerning avoidance of foreseeable harm. State liability in negligence therefore follows.[9]
The remaining question is damages. As noted, claimant was a 58-year-old widow living alone at the time of the subject assault. In addition to her stab wound (which has left a permanent scar), claimant suffered a fractured nose and a slight concussion. Her face was swollen and black and blue. *724 She was hospitalized for eight days and the hospital bill therefor shows total charges of $2,044.75. She also had two teeth broken in the assault which had to be recapped. However, no dentist bill or other evidence of this medical expense was presented at trial. There was additional evidence of subsequent uterus and/or bladder operations (with one or both being performed during a 16-day hospital stay in June, 1977), but claimant did not meet her burden of establishing by competent proof that those were causally related to the subject occurrence.
Subsequent to the assault, claimant had and continues to have trouble sleeping, including waking up in the middle of the night in a sweat. She also has headaches, high blood pressure and poor diet which the evidence indicated were results of the assault. Her testimony disclosed she was extremely frightened after her ordeal, to the point that she slept in the living room of her apartment. In fact, in November of 1977 she moved from the building where the assault occurred to another, more secure one.
Claimant’s medical expert (a psychiatrist) diagnosed her as having traumatic neurosis with chronic anxiety and depression. Without future psychiatric help, his prognosis for her was "poor”. Mrs. Robilotto stated she did see a psychiatrist after her ordeal, but apparently only briefly. She also testified to a change in her relationship with her boyfriend, including the avoidance of sexual relations. Obviously, the trauma of what claimant went through had severe and potentially permanent emotional effects. She is entitled to a significant award in order to justly compensate her for what she has suffered as a result of the State’s mindless and negligent conduct.
Accordingly, based on the foregoing and the entire record herein, the court finds claimant entitled to an award of $65,000 as compensatory damages for her past, present and future physical and mental injuries, pain and suffering and medical expenses. The State’s motions to dismiss made at trial, upon which decision was reserved, are hereby denied.
The clerk is therefore directed to enter judgment in favor of claimant Estelle Robilotto and against the State of New York in the amount of $65,000 for all damages.

. The court in its discretion has sua sponte deleted unnecessary matter from the caption and eliminated the State Department of Correctional Services as an improper party. (See CPLR 2001; Court of Claims Act, § 9.)

. The records of Johnson were meager not only because privileged matter was not admissible or even discoverable, but also because his records from the two State facilities he was in were destroyed by fire.

. Johnson’s conduct in this incident was similar to the subject occurrence in that he used a knife, hit the victim in the face, threatened to kill her and raped her.

. We note additionally that under subdivision 3 of this statute, provision is made *719 for release to other persons or agencies, including State facilities maintained therefor, where "there is no suitable parent, relative, guardian or friend,to whom a child can be released”. The State presented no evidence of any exploration of such alternatives and this further supports the court’s findings herein.

. The concept of "rewarding” a juvenile felon with the opportunity to commit more, probably violent crimes is particularly disturbing to the court. While it is certainly proper for employees of the State Division for Youth to be primarily concerned with the welfare of their young charges, that concern does not justify the tunnel-vision approach evident here. The subject statute has been amended to remedy this myopia (see Executive Law, § 523, subd 1, as amd by L 1977, ch 697; see, also, Executive Law, § 523, subd 4), but unfortunately too late for this claimant. Even if the interests of the child were the only concern, we find it hard to see how such interests are forwarded by dropping a child in an environment were he has invariably gotten into trouble, usually criminal. In any case, the statute mandated provision for suitable supervision and that direction was not followed. Thus we have found liability against the State proper.

. [5] Even if the subject release were somehow considered within the immunity found in We/ss, liability would still be proper because of the support in the instant record for findings of lack of adequate study and lack of reasonable basis with respect to suitable supervision. (See Weiss v Fote, supra, p 589; see, also, Southworth v State of New York, 62 AD2d 731, 741, affd 47 NY2d 874; Poysa v State of New York, 102 Misc 2d 269, 275.) Pertinent to the lack of adequate study, as well as evidence of negligence, was the failure of the said counselor responsible for Johnson’s release to have any psychiatric studies done on this chronic if not pathological young criminal. The said social worker had specifically suggested a psychiatric workup at least as far back as December, 1976. The counselor’s excuse for not having one done was thai such workups were not done at MacCormick, but rather at Warwick. Claimant’s psychiatric expert testified that a workup should have been done.

. Of course, as observed (see p 583), the potential liability did not result in ultimate actual liability because of the absence of sufficient foreseeability, unlike the case at hand.

. This would appear to be a species of qualified immunity. (See Drake v City of Rochester, supra; Cooper v Morin, 91 Misc 2d 302, 318-320.)

. We believe there can be little question that the State’s unsupervised release was a substantial if not pre-eminent proximate causal factor in the subject incident, or that any of claimant’s conduct was culpable. The State pleaded this latter affirmative defense, but, in the face of the egregious circumstances present, did not raise the issue here, much less prove it (see CPLR 1412).