URSULA SANTANGELO, Appellant, v STATE OF NEW YORK, Respondent. (Claim No. 58943.)

Fourth Department, April 12, 1984

APPEARANCES OF COUNSEL

*Germain & Germain* (*Paul A. Germain* of counsel), for appellant.

*Robert Abrams, Attorney-General* (*Vernon Stuart* and *Peter J. Dooley* of counsel), for respondent.

OPINION OF THE COURT

HANCOCK, JR., J. P.

Claimant was assaulted and raped by Edward Simcoe, a 16-year-old boy, who was free on an unsupervised furlough (see Correction Law, art 26) from Camp Georgetown, a minimum security facility where he was serving a sentence for robbery with a dangerous weapon. Her claim against the State is based on the negligence of the Temporary Release Committee and the Superintendent of Camp Georgetown in approving the inmate's furlough request. At trial, the Court of Claims rejected the State's contention that, as a matter of law, it was immune from liability for the alleged errors of its officials in evaluating and approving the request. Nevertheless, the court dismissed the claim finding that "the claimant [had] failed to establish, by a fair preponderance of the evidence, that the temporary

release committee knew or should have known that freeing Simcoe would create a foreseeable risk of injury" (*Santangelo v State of New York,* 103 Misc 2d 578, 585). On appeal, claimant contends that the court erred in this finding and that the evidence, particularly Simcoe's history of prior assaultive behavior involving women, compels the opposite conclusion. We need not reach the question of whether the court's finding is supported by the evidence, for we hold that the actions of the Temporary Release Committee and the Superintendent were of a discretionary and quasijudicial nature for which the State enjoys absolute immunity (see *Tango v Tulevech,* 61 NY2d 34). We therefore affirm.

I

In 1972, the "Work Release Program for State Correctional Institutions" (Correction Law, art 26, added L 1969, ch 472) was renamed "Temporary Release Programs for State Correctional Institutions" (Correction Law, art 26, as amd by L 1972, ch 339) and expanded to include, *inter alia,* a "furlough program" under which eligible inmates may leave the premises of an institution for seven days or less for such purposes as seeking employment, maintaining family ties, and attending educational courses (Correction Law, § 851, subd 4, added L 1972, ch 339). It was envisioned that the measure would "provide the highest potential for rehabilitating a positively motivated inmate by offering him the genuine hope of bettering himself, of holding his family together, and of achieving a successful return to society" (memorandum of State Executive Department, McKinney's Session Laws of NY, 1972, p 3299).

The statute (as of the time of Simcoe's release) directs that the Commissioner of Correction promulgate rules and regulations for administration of the release programs and establish a Temporary Release Committee for each appropriate institution (Correction Law, § 852, subd 1, as amd by L 1972, ch 339); and it specifies that any inmate eligible by virtue of his parole status may apply for temporary release (see Correction Law, § 851, subd 2; § 853, subd 2, as amd by L 1972, ch 339). If the Temporary Release Committee "determines that a temporary release program for the applicant is consistent with the safety of the community, is

in the best interests of rehabilitation of the applicant, and is consistent with rules and regulations of the department, the committee * * * shall develop a suitable program of temporary release for the applicant" (Correction Law, § 853, subd 4, as amd by L 1972, ch 339). The statute provides for approval of a furlough program by the Superintendent and review by the Commissioner if a request is rejected (Correction Law, § 853, subd 5, as amd by L 1972, ch 339).

Administrative Bulletin No. 63 (June 22, 1972) promulgated by the Commissioner states that in reviewing an application the Committee must consider certain criteria including whether the inmate is capable of profiting from the program and is suitable for participation, taking into consideration the potential benefits that he or others may gain as well as the safety of the community, and further that certain types of inmates "shall normally not be granted furlough" including those convicted of violent crimes; the bulletin also specifies that each furlough must have a definite purpose and "shall not normally be granted unless all other means for accomplishing the desired objective have been exhausted", and that as a precondition of each release an investigation must be conducted of the home and family which the applicant proposes to visit.

Simcoe had been sentenced on March 12, 1973, as a youthful offender to an indeterminate sentence of zero to four years for armed robbery of a woman. He was transferred to Camp Georgetown on May 21, 1973. The Temporary Release Committee, consisting of the senior correctional counselor and two assistant supervisors, on the basis of the "Inmate's Classification and Chronological" report, the report of an officer who had spoken with Simcoe's father, and other documents, approved Simcoe's written request for a furlough (to "renew family ties") on July 12, 1973. Upon the Superintendent's approval, Simcoe was granted a four-day furlough to commence on July 14, 1973. He committed the crime involving complainant on July 18, the day he was to return to Camp Georgetown. The record contains conflicting evidence as to whether by the usual standards of negligence the Temporary Release Committee exercised due care in evaluating and approving the furlough request. There is no question that Simcoe was an

"eligible inmate" (see Correction Law, § 851, subd 2) and that the Committee and Superintendent in approving his request acted within the powers vested in them by the Legislature in article 26 of the Correction Law.

## II

With the abolition of sovereign immunity upon the enactment of the Court of Claims Act, the State lost that immunity which it had hitherto enjoyed solely because of its sovereign character, and it assumed liability for the ordinary or garden variety of negligence under the same rules of law applicable to individuals and corporations (*Weiss v Fote,* 7 NY2d 579, 585, 586; *Ufnal v Cattaraugus County,* 93 AD2d 521, 523, mot for lv to app den 60 NY2d 554). It is the general rule, however, as has been often stressed, that the State has retained its immunity when the official action complained of is not ministerial but involves the exercise of discretion (see *Tango v Tulevech,* 61 NY2d 34, 40, *supra; Weiss v Fote, supra; Ufnal v Cattaraugus County, supra,* p 523; *Southworth v State of New York,* 62 AD2d 731, 740, affd 47 NY2d 874). When the action involves the conscious exercise of discretion of a judicial or quasi-judicial nature, the immunity is absolute; and such absolute immunity has been extended to a Judge in the performance of his duties (*Lange v Benedict,* 73 NY 12; *Word v City of Mount Vernon,* 65 AD2d 622, mot for lv to app den 47 NY2d 706); a District Attorney in his official actions in investigating and prosecuting crime (*Schanbarger v Kellogg,* 35 AD2d 902, mot to dismiss app granted 29 NY2d 649, cert den 405 US 919); a State Tax Commissioner in issuing a notice and demand for payment (*Abruzzo v State of New York,* 84 AD2d 876); a school official in the determination to discharge an employee (*Van Buskirk v Bleiler,* 46 AD2d 707); a Deputy Attorney-General in the performance of his duties (*Cunningham v State of New York,* 71 AD2d 181); a building inspector in granting or denying building permits (*Rottkamp v Young,* 21 AD2d 373, affd 15 NY2d 831); a senior sanitary engineer of the State Department of Environmental Conservation in his determination to deny a burning permit (*Charles O. Desch, Inc. v State of New York,* 60 AD2d 678, affd 45 NY2d 882); and employees of the State Health

Department in issuing a "mass gathering permit" for a rock music festival (*Burgundy Basin Inn v State of New York,* 47 AD2d 692, mot for lv to app den 37 NY2d 706).

Most recently the Court of Appeals has held that the Supervisor of the In-take Unit of a county Probation Department serving Family Court was fully immune from suit by a father of children in a custody dispute alleging that she illegally delivered custody to his estranged wife (*Tango v Tulevech, supra*). In so holding the court (per Simons, J.), emphasized the absolute nature of the immunity involved stating: "When confronted with the Tango-Childs dispute, defendant Tulevech conferred with the parents and the children, she inspected the documents presented and examined the children for signs of abuse, and she necessarily exercised judgment as to whether the court action was appropriate. Arguably, she was entirely correct in the present circumstances when she recognized the judgment which expressly awarded the mother permanent custody of the girls rather than the equivocal, unnotarized letter of modification. But even if her ultimate determination was incorrect, she is immune from suit because she acted within the scope of her discretionary authority as supervisor of the In-take Department (cf. *Teddy's Drive In v Cohen,* 47 NY2d 79). *Inasmuch as she was exercising her judgment in determining the proper conduct of her office and given the discretionary nature of her acts, the question of bad faith or malice becomes irrelevant under the rule stated in Rottkamp.* Although New York is in a minority position in so holding (see *Rottkamp v Young,* 15 NY2d 831, 833, *supra* [BURKE, J., dissenting]), we find no reason to reconsider the rule of that case on this record (see, generally, 2 Harper and James, Torts, § 29.10)" (*Tango v Tulevech, supra,* pp 41-42; emphasis added).

Not all actions of a discretionary nature, however, have received the full immunity accorded in *Tango v Tulevech* (61 NY2d 34, *supra*). In *Weiss v Fote* (7 NY2d 579, *supra*) involving a suit against the City of Buffalo based on a negligently designed traffic light interval, the court extended a limited immunity to the discretionary acts of officials devising a highway safety plan holding that liability could only "be predicated on proof that the plan either

was evolved without adequate study or lacked reasonable basis" (*Weiss v Fote, supra,* p 589; see discussion of *Weiss* rationale in 2C Warren, NY Negligence [3d ed], Municipal Corporations, § 5.01). The *Weiss* limited immunity rule has been applied in numerous cases involving various aspects of highway safety plans (see, e.g., *Ufnal v Cattaraugus County,* 93 AD2d 521, mot for lv to app den 60 NY2d 554, *supra* [placement of a deer crossing sign]; *Atkinson v County of Oneida,* 77 AD2d 257 [posting of stop signs]; *Cimino v City of New York,* 54 AD2d 843, affd 43 NY2d 966 [installation of a traffic light]; *Stuart-Bullock v State of New York,* 38 AD2d 626, affd 33 NY2d 418 [establishment of a speed limit]) as well as other aspects of governmental decision-making (see, e.g., *Southworth v State of New York,* 62 AD2d 731, affd 47 NY2d 874, *supra,* involving the design of an experimental driver's rehabilitation program; see, also, *Butz v Economou,* 438 US 478, pertaining to the decision of Department of Agriculture officials to institute an enforcement proceeding; *Scheuer v Rhodes,* 416 US 232, concerning actions of State officials in deploying the National Guard at Kent State University). Although not citing *Weiss,* the Second and Third Departments have accorded Parole Boards limited immunity for claims against them by a person injured by a parolee (*Brownshield v State of New York,* 76 AD2d 849; *Welch v State of New York,* 74 AD2d 661; *Taylor v State of New York,* 36 AD2d 878; but see *Robilotto v State of New York,* 104 Misc 2d 713, involving temporary release, which specifically rejects the *Weiss* limited immunity rule as well as absolute immunity, see n 2, *infra,* p 27); and certain Federal courts have adopted a qualified immunity rule with respect to Federal parole officials (see n 4, *infra,* pp 27, 28).

The immunity of public officers for the exercise of their discretionary power is founded on public policy and is generally said to reflect the value judgment that the public interest in having officials free to exercise their discretion unhampered by the fear of retaliatory lawsuits outweighs the benefits to be had from imposing liability[1] (see *Rott-*

1. In *Gregoire v Biddle* (177 F2d 579, cert den 339 US 949), the court per Chief Judge Hand held that Attorneys General and others were absolutely immune from suit by plaintiff who charged that they had maliciously and willfully arrested and imprisoned him as an enemy alien, stating: "Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later

*kamp v Young,* 21 AD2d 373, 376, affd 15 NY2d 831, *supra;* 2 Harper and James, Law of Torts, § 29.10, p 1641; 2C Warren, NY Negligence [3d ed], Municipal Corporations, § 2.03 [3] [d] [ii]). Since most actions of governmental officials involve some exercise of discretion, whether a particular action should be immune, and if so, whether the immunity should be qualified or absolute, is often a close question and depends not so much on the importance of the position held by the public official or its title as on an analysis of its function, and "the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based" (*Scheuer v Rhodes, supra,* p 247; see *Butz v Economou, supra,* pp 512-517). Whether a particular discretionary action or decision can be characterized as quasi-judicial in nature so that it results in absolute immunity depends, in general, on whether its function involves the making of decisions requiring "the exercise of reasoned judgment which could typically produce different acceptable results" (*Tango v Tulevech, supra,* p 41).

### III

Turning to the case before us, we have no difficulty in concluding that the determinations of the Temporary Release Committee and the Superintendent are inherently discretionary and clearly not the every day or garden variety of actions for which they should be answerable under the usual rules applicable to individuals and corporations (see *Weiss v Fote, supra,* p 585; *Ufnal v Cattaraugus County, supra,* p 524; see, e.g., *Williams v State of New York,* 308 NY 548, involving a claim for negligence of the State in guarding and apprehending a convict who was permitted to escape). Whether their actions involve discretion of a quasi-judicial nature deserving of the absolute immunity which would protect them even if it were shown

---

find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation" (see *Gregoire v Biddle, supra,* p 581).

that their actions lacked a rational basis or were prompted by ill will is a more difficult question. No appellate decision involving an injury due to negligence of State officials in granting a temporary release has been found.[2] In three analogous claims against the State based on negligence of the Parole Board in releasing prisoners, however, the Second and Third Departments have applied a rule of qualified immunity (*Brownshield v State of New York,* 76 AD2d 849, *supra; Welch v State of New York,* 74 AD2d 661, *supra; Taylor v State of New York,* 36 AD2d 878, *supra*).[3] Neither the Supreme Court of the United States (see *Martinez v California,* 444 US 277, 285, n 11) nor the United States Second Circuit Court of Appeals has defined the nature of immunity of employees of the Division of Parole, and those Federal courts which have addressed the question have reached different results.[4]

---

**2.** The Court of Claims in *Robilotto v State of New York* (104 Misc 2d 713) imposed liability on the State for negligence in temporarily releasing a juvenile delinquent from a State Division for Youth facility, distinguishing that case from the case at bar as it was reported below (*Santangelo v State of New York,* 103 Misc 2d 578) on the facts. The court followed *Santangelo* in rejecting absolute immunity and further rejected *Weiss* limited immunity (*Robilotto v State of New York, supra,* p 722), noting that because the release procedure in *Santangelo* involved a more extensive legislative scheme than that in *Robilotto, Santangelo* presented a stronger case for immunity than did *Robilotto.*

**3.** In *Welch v State of New York* (74 AD2d 661), the court affirmed a dismissal of a claim on behalf of a 16-year-old girl who was permanently injured as the result of an assault by a parolee from Clinton Correctional Facility stating (*Welch v State of New York, supra,* p 662): "We have previously held that while former section 212 of the Correction Law does not cloak the actions of the Board of Parole with complete judicial immunity in the release of prisoners on parole, it does immunize that body from attack where, as here, its action has support in the record (*Taylor v State of New York,* 36 AD2d 878). Section 212 of the Correction Law stated that 'The action of the board of parole in releasing prisoners shall be deemed a judicial function and shall not be reviewable if done according to law.' Since there are no allegations in the claimants' claim that the board failed to act 'according to law', the judgment cannot be attacked on that ground."

**4.** Compare *Sellars v Procunier* (641 F2d 1295, cert den 454 US 1102) and *Douglas v Muncy* (570 F2d 499) giving absolute immunity to parole officials, with *Fowler v Cross* (635 F2d 476) and *Thompson v Burke* (556 F2d 231) according them only qualified immunity; see, also, *Anderson v New York State Div. of Parole* (546 F Supp 816) granting absolute immunity (see discussion, p 28). Federal courts granting absolute immunity have applied the test of whether the official's role is " 'functionally comparable' to that of a judge" (*Butz v Economou,* 438 US 478, 513), a narrower test than that adopted in New York (see *Tango v Tulevech,* 61 NY2d 34). In applying the *Butz* test to Parole Board officials, the court in *Sellars v Procunier* (641 F2d, at pp 1302-1303) stated:

"The 'functional comparability' test * * * requires that we look not just to the title of a state or federal official, or to his or her location within the bureaucratic superstructure, but to the official's function as well in determining the question of immunity. If an official's role is functionally equivalent to that of a judge, the official will be granted equivalent immunity.

"We believe that parole board officials perform functionally comparable tasks to judges when they decide to grant, deny, or revoke parole. The daily task of both judges and parole board officials is the adjudication of specific cases or controversies. Their duty is often the same: to render impartial decisions in cases and controversies that excite

The United States District Court, however, in an action against the New York State Division of Parole, its chairperson and other involved individuals, seeking damages for illegally revoking plaintiff's parole, applied a rule of absolute immunity holding: "There can be no question that in weighing the evidence against a releasee a hearing officer performs a quasi-judicial function, or that the officers who initiate and present the case against the releasee are engaging in quasi-prosecutorial conduct. Such acts lie at the very heart of the judicial and prosecutorial roles" (*Anderson v New York State Div. of Parole*, 546 F Supp 816, 825 [SDNY]).

We find *Anderson* (*supra*) persuasive. Analyzing the functions of the Temporary Release Committee and the Superintendent in the light of *Tango v Tulevech* (61 NY2d 34, *supra*), we conclude that their actions involved discretion of a quasi-judicial nature. Like the decisions of the building inspector in *Rottkamp v Young* (21 AD2d 373, affd 15 NY2d 831, *supra*) and the probation officer in *Tango v Tulevech* (*supra*), the decision to grant temporary release involved "the exercise of reasoned judgment which could typically produce different acceptable results" (*Tango v Tulevech, supra,* p 41). Even under the more restrictive Federal test of functional comparability (see *Butz v Economou*, 438 US 478, 513, *supra*), it can be argued that like that of the parole officials in *Sellars v Procunier* (641 F2d 1295, cert den 454 US 1102), the role of the Committee and Superintendent in making a decision on temporary release is "functionally equivalent to that of a judge" (*Sellars v Procunier,* 641 F2d,. at p 1303). In acting upon Simcoe's application for furlough, the Committee was required to weigh specified criteria including his ability to profit from participation in the program, to make a determination that temporary release was "consistent with the safety of the community, [was] in the best interests of rehabilitation of the applicant, and [was] consistent with rules and regulations of the department" (Correction Law, § 853, subd 4, as amd by L 1972, ch 339), and to develop an individualized program of release for the applicant. In deciding to release him, the Committee was "exercising [its] judgment in

strong feelings because the litigant's liberty is at stake. They face the same risk of constant unfounded suits by those disappointed by the parole board's decisions."

determining the proper conduct of [its] office" (*Tango v Tulevech, supra,* p 42) as was the Superintendent in giving approval. While procedures to be followed by the Temporary Release Committee (see Correction Law, art 26) do not entail hearings and are less formal and in that sense less judicial than those involved in parole release proceedings, the Temporary Release Committee must nevertheless, like a judicial officer, exercise reasoned judgment in balancing the welfare of the applicant and the possible risks to the community in deciding whether to grant or deny temporary release and, if it is granted, in devising an appropriate plan (see *Sellars v Procunier,* 641 F2d 1295, 1302, cert den 454 US 1102, *supra; Anderson v New York State Div. of Parole, supra*).

In any event, even if a rule of qualified immunity were to be applied here, we would affirm. There is no suggestion in the record of bad faith on the part of the Temporary Release Committee or Superintendent nor can it be found on this record that their actions lacked a rational basis.

The judgment should be affirmed.

DENMAN, J. (concurring). I would affirm the judgment for reasons stated in the memorandum decision in the Court of Claims (*Santangelo v State of New York,* 103 Misc 2d 578 [Lowery, J.]). The majority adopts the position that all determinations made by a State functionary in the exercise of discretion are quasi-judicial and thus entitled to absolute immunity. I cannot espouse that view nor do I read *Tango v Tulevech* (61 NY2d 34), as requiring that we do so. If that were the import of *Tango,* a significant body of law recognizing the potential liability of the State for discretionary acts would be wiped out *sub silentio.* (See, e.g., *Williams v State of New York,* 308 NY 548; *Weiss v Fote,* 7 NY2d 579; *Brownshield v State of New York,* 76 AD2d 849; *Welch v State of New York,* 74 AD2d 661; *Taylor v State of New York,* 36 AD2d 878.)

BOOMER, O'DONNELL and SCHNEPP, JJ., concur with HANCOCK, JR., J. P.; DENMAN, J., concurs in an opinion.

Judgment affirmed, without costs.