[680 NYS2d 370]

Anthony Sebastian et al., Appellants, v State of New York, Respondent.

Fourth Department, November 13, 1998

APPEARANCES OF COUNSEL

*Magner & Love, P. C.,* Buffalo (*Shawn W. Carey,* of counsel), for appellants.

*Dennis C. Vacco, Attorney-General,* Albany (*Lisa LeCours* of counsel), for respondent.

**OPINION OF THE COURT**

LAWTON, J.

The issue on this appeal is whether defendant, the State of New York (State), may be held liable for injuries caused by an escapee from a New York State Division for Youth (DFY) facility in the absence of a special relationship between the State and the injured person.

In 1992 Daniel Chadderdon was adjudicated a juvenile delinquent. He was placed in the custody of DFY and was initially held at DFY's Masten Park Facility in Buffalo. In March 1994 he was transferred to a DFY facility outside of Rochester and in July 1995 he was transferred to a DFY facility in Binghamton. He escaped from that facility 11 days later. Approximately one month after the escape, Chadderdon robbed and beat Anthony Sebastian (claimant) into unconsciousness, dragged him out of his cab and ran over him with his cab. Chadderdon subsequently was convicted, *inter alia,* of attempted murder in the second degree and robbery in the first degree.

Nineteen months after the assault, claimant and his wife moved for leave to file a late claim against the State. In support of their motion for leave to file a late claim, claimants enumerated the serious injuries claimant had suffered, which had incapacitated him for an extensive period of time, and stated that they were unable to ascertain earlier Chadderdon's violent history because of the confidentiality of DFY records (*see,* Social Services Law § 372 [4]; Executive Law § 501-c [1] [b]). The Court of Claims properly denied the motion on the ground that claimants had failed to show a "special relationship" with the State.

The proposed claim alleges that claimant's injuries are the result of the State's negligence in failing to prevent the escape of Chadderdon, provide adequate notice of the escape or take reasonable measures to capture him. Because those negligence claims arise out of the State's performance of a governmental function and because no special relationship exists between the State and claimant, the State cannot be held liable to claimant for its alleged negligence (*see, Kircher v City of Jamestown,* 74

NY2d 251, 255-256; *Miller v State of New York*, 62 NY2d 506, 510; *Williams v State of New York*, 308 NY 548, 556-558; *Cossano v State of New York*, 129 AD2d 671).

In reaching that conclusion, I reject the dissent's position that the detention of a juvenile delinquent in a DFY facility constitutes proprietary activity analogous to the State's provision of in-patient medical and psychiatric care. Unlike patients receiving medical or psychiatric care at State facilities, all juvenile delinquents are placed in the custody of DFY by court order (*see*, Family Ct Act § 353.3). More significantly, medical and psychiatric patients are admitted to State facilities for treatment of their illnesses, while juvenile delinquents are placed with DFY because they "committed an act that would constitute a crime if committed by an adult" (Family Ct Act § 301.2 [1]). The fact that rehabilitation is the ultimate aim of the juvenile justice system does not transform the detention of juvenile delinquents into a proprietary function. Indeed, the Legislature has recognized that, with respect to the placement of juvenile delinquents, "the presentment agency's paramount responsibility [is] to protect the safety of the community" (L 1985, ch 880, § 1). Protecting society by removing persons who commit criminal acts from the community and placing them in appropriate facilities is a uniquely governmental function. Whether the placement is in an adult prison or a juvenile facility, the governmental function is the same, i.e., the protection of the community. Thus, absent the existence of a special relationship, the State is not liable for injuries caused by an adult prisoner or a juvenile delinquent who escapes from the State's custody (*see*, *Williams v State of New York, supra*, at 556-558; *Cossano v State of New York, supra; see also, Marilyn S. v City of New York*, 134 AD2d 583, 584, *affd* 73 NY2d 910). Finally, I note that the conclusion reached by the dissent will have a deleterious impact on the rehabilitative goals it emphasizes. To avoid the potential liability created by the dissent, those who have custody of juvenile delinquents will be required to focus their efforts and resources on confinement rather than rehabilitation. Accordingly, for reasons of sound precedent and policy, the order should be affirmed.

BOEHM, J. (dissenting.) The issue on this appeal is whether the State of New York (State) may be held liable for injuries caused by an escapee from a New York State Division for Youth (DFY) facility in the absence of a special relationship between the State and the injured person. I respectfully dissent from the majority's position that it may not.

Anthony Sebastian (claimant) was robbed and beaten into unconsciousness by Daniel Chadderdon, who then dragged claimant out of his cab and drove the rear wheel of the cab over claimant's head and face. Claimant survived but has sustained permanent and extensive disfigurement of his face. All of his facial bones were fractured, requiring three surgical procedures and the insertion of nine permanent metal plates. Metal plates were also inserted to stabilize his neck. Claimant further sustained a crushed larynx and traumatic brain injuries. Chadderdon subsequently was convicted, *inter alia*, of attempted murder in the second degree and robbery in the first degree.

Before the incident, which occurred in 1995, Chadderdon had been adjudicated a juvenile delinquent in July 1992. He was placed in the custody of DFY and was initially held at DFY's Masten Park Facility in Buffalo. In March 1994 he was transferred to a DFY facility outside of Rochester and in July 1995 he was transferred to a DFY facility in Binghamton. He escaped from that facility 11 days later and, on August 19, 1995, he called a young woman with whom he had become friendly while he was at the Masten Park Facility. He arranged to visit her in Buffalo, where she and some of her friends met him. None of them was aware of his escape. They went to Tonawanda and, late in the evening, they called a cab. Claimant, who was driving the cab, was directed by Chadderdon to drive him to a school parking lot in Tonawanda, where Chadderdon robbed and assaulted claimant.

Nineteen months after the assault, claimant and his wife moved for leave to file a late claim against defendant, the State. In support of their motion for leave to file a late claim, claimants enumerated the serious injuries claimant had suffered, which had incapacitated him for an extensive period of time, and they asserted that they were unable to ascertain earlier whether DFY had a record of Chadderdon's violent history because of the confidentiality of DFY records (*see*, Social Services Law § 372 [4]; Executive Law § 501-c [1] [b]). Claimant first became aware of Chadderdon's lengthy violent history when he spoke to Chadderdon's sister after Chadderdon was convicted. Claimant was informed that Chadderdon had beaten another DFY facility resident into a coma with a chair, set fire to a barn, assaulted children and threatened to kill his own mother. Further, the District Attorney's office made its confidential case file available to claimants only after the prosecution of Chadderdon was completed. Although the Court of

Claims determined that the State had knowledge of Chadderdon's violent and dangerous "criminal propensities and, therefore, should have been aware that inaction would lead to harm", it nevertheless denied the motion, holding that claimants had failed to show a "special relationship" with the State.

The State concedes that the only factor at issue in determining whether to permit the filing of a late claim is "whether the claim appears to be meritorious" (Court of Claims Act § 10 [6]). Claimants contend that the "special duty" rule has no application where the State engages in a proprietary function when it places a juvenile in a juvenile facility or group home.

Government agencies are immune from negligence claims arising out of the performance of a governmental function "unless the injured person establishes a special relationship with the entity, which would create a specific duty to protect that individual, and the individual relied on the performance of that duty" (*Miller v State of New York*, 62 NY2d 506, 510; *see, Kircher v City of Jamestown*, 74 NY2d 251, 255-256). Thus, the State is not liable for injuries caused by an escaped prison inmate in the absence of a special relationship between the State and the injured person (*see, Williams v State of New York*, 308 NY 548, 554-555; *Cossano v State of New York*, 129 AD2d 671).

When the State acts in a proprietary capacity, however, it is subject to the same principles of tort law regarding liability as are private persons or institutions (*see, Miller v State of New York, supra*, at 511). "[A] public entity may not escape liability for negligent acts which it performs in a proprietary capacity and which are a proximate cause of an injury which was sustained as the result of a foreseeable act by a third party" (*Marilyn S. v City of New York*, 134 AD2d 583, 584, *affd* 73 NY2d 910 *for reasons stated below*). Thus, "where the State engages in a proprietary function such as providing medical and psychiatric care, it is held to the same duty of care as private individuals and institutions engaged in the same activity" (*Rattray v State of New York*, 223 AD2d 356, 357; *see, Schrempf v State of New York*, 66 NY2d 289, 294; *Amadon v State of New York*, 182 AD2d 955, 957, *lv denied* 81 NY2d 701). Based on this principle, the State has been held liable for negligently permitting a mental patient to escape, or for negligently discharging a mental patient or releasing the mental patient to outpatient care (*see, Schrempf v State of New York, supra*, at 295).

The care of children has traditionally been assumed by parents or other suitable private individuals and agencies.

Parents who know of the dangerous propensities of their child are bound to take reasonable steps to prevent the child from harming others (*see, Linder v Bidner*, 50 Misc 2d 320, 322; PJI 2:261). This duty is extended when, for example, a county assumes responsibility for the care of a child; it thereby becomes responsible for the health, safety and welfare of the child even after placement (*see, Andrews v County of Otsego*, 112 Misc 2d 37). When the State assumes custody of a juvenile, it too stands in the relation of loco parentis and owes to others the same duty of care as parents and agencies engaged in the same activity (*see, Wasserstein v State of New York*, 32 AD2d 119, 120, *affd* 27 NY2d 627; *see also, Rattray v State of New York*, *supra*, at 357). Thus, it becomes "responsible for vicious acts of the 'child' where it had notice of his propensities therefor" (*Robilotto v State of New York*, 104 Misc 2d 713, 720; *see, Linder v Bidner*, *supra*, at 322). In *Robilotto*, the State was found liable for the vicious assault by a juvenile delinquent who was negligently released from a DFY facility.

Contrary to the contention of the State, the custody of juvenile delinquents in State facilities is not exclusively a governmental function comparable to the incarceration of adults in State prison. Whereas the custody of prisoners is entirely a governmental function, the care and custody of mental patients and juvenile delinquents are assumed by both the public and private sectors. For example, a juvenile delinquent may be placed by Family Court in the child's own home, in the custody of a suitable relative or other suitable private persons, an authorized agency, the Commissioner of Social Services or a DFY facility (*see*, Family Ct Act § 353.3). The range of options also includes placement in foster care or a private residential care agency, such as the George Junior Republic, and other similar private custodial institutions (*see*, Sobie, Practice Commentary, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 353.3, at 531 [1983 ed]).

It is therefore difficult to draw a plausible distinction between a State mental hospital and a State juvenile facility in determining vulnerability for injuries caused by one who escapes from either institution. If operating a State mental hospital is a proprietary function because there are privately owned and operated mental hospitals, then such a classification must include, *pari passu*, operating a juvenile facility, as well. The law applicable to one necessarily becomes applicable to the other.

The categorization for purposes of liability becomes even more pronounced when one compares the essential purposes of

a mental hospital and a penal institution. The primary purpose of a mental hospital is treatment, whereas that of a penal institution is punishment and deterrence; regrettably, rehabilitation has been proven to be an unachievable ideal. Similarly, unlike persons sentenced to penal institutions, the primary purpose of placement of juvenile delinquents is not punishment but rehabilitation, although "the need for protection of the community" (Family Ct Act § 301.1) is also a consideration. "The historic purpose of the juvenile justice system has been the rehabilitation of children through supervision or placement with specialized juvenile programs" (Sobie, Practice Commentary, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 301.1, at 263 [1983 ed]). Moreover, proceedings under the Family Court Act, as under the Mental Hygiene Law, are civil, not criminal. The emphasis is rehabilitation and treatment, not punishment. Early on, the humane purpose of laws dealing with juveniles was the guidance and redemption of neglected and delinquent children (*see, People v Lewis*, 260 NY 171, *appeal dismissed and cert denied* 289 US 709; *Matter of Rudy S.*, 100 Misc 2d 1112). However, because of the due process considerations involved in restrictive placement, case law recognized that juvenile delinquency proceedings are at least quasi-criminal in nature (*see, Matter of Quinton A.*, 49 NY2d 328, 335). Nevertheless, the Court of Appeals in *Matter of Quinton A.* (*supra*, at 334-335) stated: "In assessing appellant's due process challenge, it is well to remember that the primary thrust of article 7 of the Family Court Act is treatment and rehabilitation, rather than deterrence or retribution—concerns traditionally associated with criminal law (see Mack, The Juvenile Court, 23 Harv L Rev 104). Hence, in most cases the Legislature has chosen not to brand the juvenile who commits an act which would otherwise be a crime a criminal, but recognizes that he is a person not fully responsible for his conduct (see Matter of Samuel W., 24 NY2d 196, revd on other grounds *sub nom. Matter of Winship*, 397 US 358; but see L 1978, chs 478, 481). It has taken a path designed not solely to punish the malefactor but to extinguish the causes of juvenile delinquency through rehabilitation and treatment".

The emphasis remains rehabilitation, care and guidance, even when a juvenile is placed with DFY. That agency has the duty to "operate and maintain secure, limited secure and non-secure facilities for the care, custody, treatment, housing, education, rehabilitation and guidance of youth placed with or committed to the division" (Executive Law § 504 [1]). The emphasis is again rehabilitation and guidance.

Thus, there is a paramount societal purpose in distinguishing between the duty of the State with respect to prisoners confined in a penal institution and its duty with respect to juveniles placed in a DFY facility. And, as an important consequence of this purpose, the State is held to the same duty of care when a juvenile is placed in its care as when a person suffering from a mental illness is placed in its care.

I disagree with the majority that the rehabilitative purpose of a juvenile facility will be diluted by imposing liability when a juvenile with a violent history is allowed to escape. Those infrequent occasions will not have a deleterious impact on the rehabilitation programs in juvenile facilities. That same argument could be made regarding mental hospitals, but there is no evidence that the desire to avoid liability has had a negative effect on the quality of their patient care and treatment.

Claimants' proposed claim alleges that the State was aware of Chadderdon's violent propensities, that it was negligent in its supervision of him and that it permitted Chadderdon to escape and failed to take reasonable steps to apprehend him after the escape. Claimants' allegations demonstrate that "the claim appears to be meritorious" (Court of Claims Act § 10 [6]), and therefore I would reverse and grant claimants' motion to file a late claim.

GREEN, J. P., and CALLAHAN, J., concur with LAWTON, J.; BOEHM, J., dissents and votes to reverse in a separate opinion in which FALLON, J., concurs.

Order affirmed, without costs.