JOHN V. SOUTHWORTH, Individually and as Executor of ALICE K. SOUTHWORTH, Deceased, Respondent, v STATE OF NEW YORK, Appellant. (Claim No. 58065.)

JOHN V. SOUTHWORTH, Respondent, v STATE OF NEW YORK, Appellant. (Claim No. 58835.)

Fourth Department, June 2, 1978

## APPEARANCES OF COUNSEL

*Louis J. Lefkowitz, Attorney-General (Douglas L. Manley* and *Ruth Kessler Toch* of counsel), for appellant.

*Bond, Schoeneck & King (Charles Major* of counsel), for respondent.

## OPINION OF THE COURT

DILLON, J.

In connection with an experimental drivers' rehabilitation program established by the Commissioner of Motor Vehicles, we are asked to decide whether the issuance of an interim operator's license to a person with a record of alcohol-related driving violations renders the State liable for injuries and wrongful death sustained by others on account of the negli-

gence of the interim licensee in the operation of his motor vehicle while intoxicated.

John Southworth was seriously injured and his wife Alice was killed as a result of a collision which occurred on Route 175 near Syracuse on the evening of August 31, 1973. An eastbound vehicle operated by Uldis Baumanis, to whom an interim driver's license had been issued two days earlier, crossed into the westbound lane and collided with the oncoming Southworth vehicle. As a consequence of the accident, Mr. Baumanis was convicted of driving while intoxicated (as a felony) and criminally negligent homicide.

In these actions it is claimed that the State is responsible for the injuries to Mr. Southworth and the death of Mrs. Southworth because its agents and employees were negligent in establishing and operating the Onondaga County Driving While Intoxicated (DWI) Counter-Attack Program (Onondaga Program) in violation of the statutory authority for its creation, and were further negligent in issuing the interim driver's license to Mr. Baumanis who, it is said, was not a proper candidate for such a license. The cases were tried in the Court of Claims on the issue of liability only, the parties having stipulated to reserve the issue of damages for later trial in the event liability was found. The trial court determined that the State's agents and employees were negligent; that such negligence was the proximate cause of the injuries to Mr. Southworth and the death of Mrs. Southworth; and that the claims were not proscribed by the doctrine of sovereign immunity. We reverse and dismiss the claims.

In an effort to improve highway safety, the Legislature in 1968 enacted article 21 of the Vehicle and Traffic Law to provide for the creation, by regulation, of "Experimental Driver Rehabilitation Programs" by the commissioner of Motor Vehicles (L 1968, ch 464).[1] Broad authority was given to the commissioner "to institute * * * studies and experimental programs designed to determine the most effective methods of improving driver skills and attitudes in order to reduce traffic

---

1. The issue of negligence must be resolved in accordance with the law extant on August 29, 1973 when Mr. Baumanis was issued the interim license under the Onondaga program. Statutory references herein are as they were in effect on that date. This is noted because the trial court apparently failed to consider 1970 amendments.

The original act was repealed in 1975 and article 21 was re-enacted in somewhat different form (L 1975, ch 291).

violations and motor vehicle accidents" (Vehicle and Traffic Law, § 520).

The legislation also provided for the appointment by the commissioner of a Driver Rehabilitation Advisory Board (board) (Vehicle and Traffic Law, § 522, subd 1), the function of which was to advise the commissioner with respect to the nature and content of educational courses to be offered in conjunction with a program and to establish criteria for the selection of candidates (Vehicle and Traffic Law, § 522). Participation in a program was restricted to those persons referred by the board (Vehicle and Traffic Law, § 521, subd 1, par [c]).

The board was appointed in 1969 and between June, 1970 and May, 1971 the commissioner established five separate experimental programs; one each to be operated in New York City, Monroe County, Nassau County, Suffolk County, and another for operation in Onondaga, Erie and Westchester Counties. The Onondaga program was a co-operative venture of the Department of Motor Vehicles, Onondaga Community College and the Automobile Club of Syracuse.

Uldis Baumanis was convicted in the Town of Cicero on August 22, 1973 for having driven on March 15, 1973 while his ability was impaired by alcohol. In accordance with procedures established by the commissioner, the Cicero Town Justice forwarded Baumanis' driver's license and a certificate of conviction to the Syracuse office of the Department of Motor Vehicles, from which the Onondaga program was operated. He did not, however, immediately forward the renewal section of the license, which should have contained a record of previous convictions.

Mr. Baumanis made an appointment to appear at that office on August 29, 1973. In advance of the appointment he was tentatively approved as an appropriate candidate by the district director's office, based upon the documents which had been received from the Town Justice, together with a computer-produced abstract of his driving record which had been procured from the department's Albany office.[2] The abstract did not reveal that Mr. Baumanis had been arrested in 1971 for driving while intoxicated in the Town of Onondaga and was convicted of that charge on August 21, 1973, the day preceding his conviction in the Town of Cicero.

---

2. The abstract showed only minor traffic convictions in 1969. It did not indicate that Mr. Baumanis was convicted of a speeding and a stop sign violation in 1970.

At the time of the Onondaga conviction the Town Justice neither took possession of Mr. Baumanis' license nor did he note the conviction on the renewal section. In disregard of a departmental directive to mail certificates of conviction to the Syracuse district office the Town Justice mailed that of Mr. Baumanis to the department's Albany office where it was received on August 27, too late to be reflected on the computer abstract of Mr. Baumanis' driving record which was furnished to the Syracuse office.[3] Thus, when Mr. Baumanis was tentatively approved for the Onondaga DWI program, the district director's office was unaware of the conviction in the Town of Onondaga for which his license was subject to mandatory revocation.

Mr. Baumanis appeared at the Syracuse district office on August 29 where he signed the appropriate application forms and was interviewed by a Mrs. Cordon who was an employee of the program.[4] She immediately noted the absence of the renewal section of his license and brought that to the attention of the assistant director, who called the Cicero Town Justice and learned that it had been mailed to the district office on the previous day.[5] She also learned from Mr. Baumanis that earlier in 1973 he had been a voluntary patient for the treatment of alcoholism at a facility in Syracuse and that he carried an antabuse card.[6] Neither she nor the assistant director was familiar with the purpose of an antabuse card and, upon the assistant director's instruction, she telephoned the co-ordinator of the program at the department's Albany office and was informed that Mr. Baumanis should not be disqualified on that basis. In keeping with the normal practice

3. The evidence shows that upon receipt of the certificate, the normal processing time for a conviction to be shown on a computer printout was approximately three days.

4. It appears that Mrs. Cordon was actually paid by Onondaga Community College. Her duty was to explain the program, instruct the applicant as to the time and place of the rehabilitation courses, answer any questions the applicant might have, and issue the interim permit. Should it appear by reason of any physical or other disability, that the applicant might not be a proper subject for the program, she was to consult further with the district director or the assistant director before issuing the permit.

5. The absence of the renewal section during the interview is of no significance since, as previously indicated, the Onondaga Town Justice had failed to note the DWI conviction thereon.

6. Antabuse is a drug which, when taken in conjunction with the consumption of alcohol, will cause violent illness. The card is carried for the information of treating physicians.

of relying upon the computer abstract of convictions, Mrs. Cordon made no inquiry of Mr. Baumanis as to his previous driving record and thus did not know of his prior conviction for driving while intoxicated in the Town of Onondaga. She issued the interim license and two days later Mr. Baumanis was involved in the accident with the Southworth vehicle.

The trial court's assessment of the State's negligence may be divided into two parts, the first of which pertained to purported statutory violations. The court found that the commissioner failed to establish the Onondaga program "by regulation"; failed to consult with and utilize the expertise of the board concerning the operation of the program; and accepted candidates into the program who were not referred by the board. Additionally, the court found that participation by any person who stood convicted of driving while intoxicated was statutorily prohibited.

■ While it is true that the commissioner failed to create the program by regulation, his power to have done so cannot be questioned (Vehicle and Traffic Law, § 521, subd 1). The program was instituted in furtherance of a declared public policy and was implemented by a series of administrative memoranda. The omission of the commissioner is not to be condoned, but it is remote from the issues here and may not form the predicate for actionable negligence against the State.

Considering next the board's relationship to the Onondaga program, there was ample evidence before the court to demonstrate that all five experimental programs were established in consultation with that body and that the varying criteria set down for the selection of candidates in each of the programs were specifically recommended by the board (see Department of Motor Vehicles Review of Experimental Driver Rehabilitation Programs, submitted to the Governor and Members of the Legislature, December, 1974, pp 4-6). It was the board's view that in the New York City and Monroe County experiments, candidates should be selected at random from among those whose licenses were subject to revocation or suspension, without regard to the underlying violation; that in Nassau County, participation should be limited to randomly selected drivers convicted of alcohol-related offenses; and that in Suffolk County, participants should be similarly selected, but only from among those convicted of driving while intoxicated.

The Onondaga program differed from the other four in that

participation was not based upon random selection but was open to almost all of those convicted of alcohol-related offenses. The policy in that regard was reflected in a departmental memorandum of October 15, 1971: "A basic premise of this program * * * is that everyone who is convicted by one of the participating courts for a drinking and driving charge or [whose license] has * * * been revoked for refusal of a chemical test, will be invited to participate in the program * * * The district directors will understand that the program relies on the fact that most of the convictees be enrolled in the program. However, if they note some physical disability or for some other reason have reservations about allowing the driver into the program, they may consult a referee or the director of driver safety to determine whether giving this man back his license will cause an undue safety hazard."

■ Although none of the candidates for the program was individually referred by the board (see Vehicle and Traffic Law, § 521, subd 1, par [c]), the broadly inclusive method of candidate selection was approved by the board and the commissioner, in response to a recommendation of the New York State Automobile Association (see Department of Motor Vehicles Review of Experimental Driver Rehabilitation Programs, submitted to the Governor and Members of the Legislature, December, 1974, pp 5-6, *supra).* Thus every candidate who was otherwise statutorily qualified and who was accepted into the Onondaga program pursuant to the board's approved criteria, may be viewed as having been "referred" by the board in compliance with the statute. It is readily apparent that the large number of individuals eligible for the Onondaga program rendered impractical a personalized review of each application by the board.

■ The trial court was clearly in error in holding that one convicted of driving while intoxicated was automatically ineligible for the Onondaga program. Quite the opposite was true. That the legislative goal was to experiment with only the more serious violators is evident from the statutory requirement that participation was limited to those whose driver's licenses were "subject to either mandatory or permissive suspension or revocation and against whom there is a tentative order of suspension or revocation" (Vehicle and Traffic Law, § 521, subd 1, par [b]). Qualified candidates included those persons who stood convicted under section 1192 of the Vehicle and Traffic Law of driving while intoxicated or driving

while ability was impaired by the consumption of alcohol (see Vehicle and Traffic Law, § 521, subd 1, par [b], as amd by L 1970, ch 679, § 5; cf. Vehicle and Traffic Law, § 510, subd 2, par a, cls [i], [ii], [iii]; cf. also Vehicle and Traffic Law, § 510, subd 6). Any person participating in a program was permitted to retain his driver's license, provided he complied with the program's "attendance [and] other requirements" (Vehicle and Traffic Law, § 521, subd 1, par [d]). In approving the legislation, the Governor stated, *inter alia:* "The bill, by establishing an alternative to license suspensions or revocations, will extend the concept of driver improvement through driver training, and will allow for a comparison between the effectiveness of license suspension or revocation and that of mandatory participation in rehabilitation sessions" (Governor's Memorandum, approving L 1968, ch 464, NY Legis Annual, 1968, p 471).

It is apparent that the implementation of any program under such broad statutory authority was fraught with danger. One of the expressed legislative and executive intentions was to permit those whose right to operate a vehicle would otherwise have been withdrawn, to continue to drive upon the public highways with the prospect that the educational programs attendant on that permission would prove a better alternative to those then available. It was by "comparison" that the ultimate determination of "the most effective methods of improving driver skills and attitudes" would be made.

Inherent in the nature of the legislation was the perception of potential imminent risk to others in the hope that, in the long run, public safety would be enhanced. It is that perception of risk and a concern for the planning and other decisions consequently made in the implementation of the legislation which lead us to a consideration of the doctrine of governmental immunity.

By its waiver of sovereign immunity (Court of Claims Act, § 8), "the State assumed liability for its conduct and consented to have such liability determined in accordance with the same rules of law applicable to individuals and corporations" *(Florence v Goldberg,* 44 NY2d 189, 194). At the same time, the State has retained its immunity in areas involving the exercise of expert judgment in the course of governmental planning for the public safety *(Weiss v Fote,* 7 NY2d 579, 587). Whether that immunity is to be affixed to a particular area of State action, however, must be addressed in

terms of the duty, if any, owed to the claimant. "[I]t is not the label 'governmental' which protects the planning decisions of a municipal entity; it is simply the fact that the law of negligence does not impose liability upon a government or, for that matter, upon an individual unless there is a breach of a duty" *(Pratt v Robinson,* 39 NY2d 554, 563). Thus, in *Granger v State of New York* (14 AD2d 645), the failure of the Commissioner of Motor Vehicles to revoke a driver's motor vehicle registration, despite a statutory requirement for its revocation, resulted in no breach of duty to a claimant who was injured in a subsequent accident.

■ The experimental licensing program here will furnish no basis for the State's liability in the absence of a breach of duty to the claimant supported by proof that the program was the product of inadequate study or that it lacked any reasonable basis, or that it was improperly operated (see *Weiss v Fote, supra,* p 589).

No evidence was offered to challenge the rationality of the program and thus our focus turns to that part of the trial court's determination of negligence relating to its operation. In that connection the court found that the screening process was inadequate to discover the nature of the risk to be assumed in granting an interim permit to Mr. Baumanis. The essence of this contention revolves about the failure of the issuing agency to be aware of his prior conviction for driving while intoxicated, a factor which, it is argued, would have disqualified Mr. Baumanis under both the commissioner's operating guidelines and the applicable statutes.

The guidelines provided that no person should be accepted into the program who did not have a valid license or whose license had been revoked prior to the revocation or suspension order constituting the basis for his participation. Such a directive was compatible with the statutory provision that upon a mandatory license revocation, no new license may be issued "for at least six months * * * after such revocation" (Vehicle and Traffic Law, § 510, subd 6; cf. Vehicle and Traffic Law, § 521, subd 1, par [d]). Since the license of Mr. Baumanis necessarily was revoked by the Onondaga Town Justice on August 21, 1973, it is claimed that he was not a qualified participant.

In the view taken of this case, it is unnecessary to decide the issue of the eligibility of Mr. Baumanis. We note only that the guidelines permit a contrary interpretation, since he was

a properly licensed driver on the date of his arrest in the Town of Cicero and he was not convicted until after the conviction in the Town of Onondaga. Moreover, the authority to have included the Town of Onondaga conviction as part of the "basis for [his] participation" in the program cannot be questioned (Vehicle and Traffic Law, § 521, subd 1, par [d]).

It is charged that the State knew or should have known of the prior conviction by virtue of the arrival of the certificate of conviction at the department's Albany office on August 27, two days before the issuance of the interim license to Mr. Baumanis. We do not agree. There is no dispute that the employees of the Onondaga program did not have actual notice of the conviction and in consideration of the complexities of the departmental operation and its consequent reliance upon computerization, we will not premise a finding of notice upon the presence of the certificate on a clerk's desk in Albany.

The question of whether constructive notice should be assessed to the State in the context of this case depends not only on "whether an inquiry would have revealed the fact, but also whether, acting as an ordinarily prudent person would have done, the person to be charged was called upon, under the circumstances, to make inquiry" (42 NY Jur, Notice and Notices, § 17).

It was the duty of the employees of the Onondaga program to comply with the procedures which had been established for its operation. Those procedures included built-in safeguards which, in the normal course, would have disclosed the prior conviction. That it was not disclosed was primarily attributable not to any failure on the part of employees of the program but rather in part to the failure of others and in part to the novel circumstances here presented.

This is not to say that the procedural operation was unreasonably defective. While it is suggested that additional procedural steps should have been devised so as to guarantee that no interim license would be improperly issued, judicial inquiry must be limited to the question of whether the approved procedure was reasonably geared to the acceptance of only those qualified for participation (cf. *Weiss v Fote,* 7 NY2d 579, *supra).* We find that it was. The issuing office was required to review the computer abstract of the applicant's driving record which ordinarily would have revealed all prior convictions. The renewal portion of the applicant's license was also to be

examined. When it was not in hand, Mrs. Cordon took additional steps to ascertain its location and, indeed, had it been immediately available, it would not have divulged the Town of Onondaga conviction because it had not been entered thereon by the Town Justice. Additionally, although as a participating court, the Onondaga Justice, like all others, had been requested to forward certificates of conviction to the Syracuse office, here it was forwarded to the Albany office.

■ Had the Onondaga Town Justice adhered to proper procedure in fulfilling his responsibilities, the employees of the Onondaga program would have been aware of the claimed impediment to the Baumanis application. It is precisely because they were unaware of the prior conviction that claimants' reliance upon *McCrink v City of New York* (296 NY 99) is misplaced. There a police officer who was known by the police commissioner to be a drunkard with vicious propensities, was retained on the police force. In deciding that this officer's patently unjustifiable shooting of two men supported a cause of action against the City of New York, the court held that if it was determined as a matter of fact that the retention of the officer involved a known risk to others reasonably to be foreseen, then the police commissioner was without discretion to retain him on the force since the risk created a duty to remove him; a duty which superseded discretion. Although the *McCrink* court, in effect, reviewed an exercise of discretion, the officer's personnel record was such that under any reasonable view, he should have been discharged from the police force *(Riss v City of New York,* 22 NY2d 579, 588-589 [KEATING, J., dissenting]). In a similar case, the Court of Appeals subsequently declined to review the judgment of police officials where the record of an officer presented an arguable question as to whether he should or should not have been retained *(Milker v City of New York,* 36 NY2d 973).

■ The procedures adopted for this experimental drivers' program reflect the policy judgment of the State's managerial and executive personnel acting within the province of their professional capacities. The soundness of the established method of operation is beyond review *(Kelly v State of New York,* 57 AD2d 320, 328, 332) for the reason that such review would constitute a judicial incursion into the immunized area of basic policy decision-making of a co-ordinate branch of government *(Jones v State of New York,* 33 NY2d 275, 286 [JASEN, J., dissenting]).

Nor may it be said here that circumstances were such when Mr. Baumanis was granted the interim permit that there was no reasonable view under which it should have been granted. It remains the law that the "risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation" *(Palsgraf v Long Is. R. R. Co.,* 248 NY 339, 344). The perceptible risk here was not beyond that contemplated by the Legislature and Executive in authorizing the program. Thus there arose no duty to the claimant which was breached by the issuance of the interim license to Mr. Baumanis.

The judgments should be reversed and the claims dismissed.

HANCOCK, JR., J. (dissenting). I dissent. The doctrine of governmental immunity should not shield the State of New York from liability for its negligence in implementing and administering a concededly hazardous[1] experimental program in which drinking drivers, who would otherwise be prohibited by law from driving upon the highways, are permitted to do so (see *McCrink v City of New York,* 296 NY 99, 106; *Benway v City of Watertown,* 1 AD2d 465; *Southworth v State of New York,* 82 Misc 2d 400, 404, 405, 406, and cases cited therein). The liability here is not founded upon a mere error of judgment of the State officials in making the unfortunate determination that Baumanis be permitted to drive with the tragic consequences that ensued *(Newiadony v State of New York,* 276 App Div 59, 61). Liability rests, rather, upon the failure of the State officials, having elected to proceed with the risky undertaking, to establish reasonable safeguards and procedures calculated to minimize that risk to others by preventing known problem drinkers such a Baumanis with a record of repeated alcohol-related violations from driving. In embarking upon the experimental program designed to improve driver safety and reduce the incidence of accidents (see Statement of findings and declaration of purpose, Vehicle and Traffic Law, § 520), the State assumed a duty to those who use the high-

---

1. The majority opinion states:

"It is apparent that the implementation of any program under such broad statutory authority was fraught with danger. One of the expressed legislative and executive intentions was to permit those whose right to operate a vehicle would otherwise have been withdrawn, to continue to drive upon the public highways with the prospect that the educational programs attendant to that permission would prove a better alternative to those then available. It was by 'comparison' that the ultimate determination of 'the most effective methods of improving driver skills and attitudes' would be made.

"Inherent in the nature of the legislation was the perception of potential imminent risk to others in the hope that, in the long run, public safety would be enhanced."

ways to conduct the program in a nonnegligent manner (*Florence v Goldberg,* 44 NY2d 189; *Schuster v City of New York,* 5 NY2d 75; *Southworth v State of New York,* 82 Misc 2d 400, 406, *supra).* As stated by Chief Judge CARDOZO: "The hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all" *(Moch Co. v Rennsselaer Water Co.,* 247 NY 160, 167). Further, where, as here, there is inherent in the undertaking an unavoidable increase in the risk that injury may occur, the State has a duty to employ that degree of care and foresight which is commensurate with the reasonable probability of its occurrence *(McCrink v City of New York,* 296 NY 99, 106, *supra; Van Leet v Kilmer,* 252 NY 454, 457).

In my opinion the record fully supports the conclusions set forth in the well-reasoned decision of the trial court that the State did not exercise care commensurate with the risks in the implementation and administration of the DWI Counter-Attack Program in Onondaga County and that this failure was the proximate cause of the accident.

The temporary driving permit was issued on August 29, 1973 to Baumanis, a man who had recently been discharged from an institution for alcoholism, who was carrying an "Antabuse Drug Card", who had been convicted for driving while intoxicated (Vehicle and Traffic Law, § 1192, subd 2) on August 21, 1973 and for driving while his ability was impaired by alcohol (Vehicle and Traffic Law, § 1192, subd 1) on August 22, 1973. The clerk who issued the permit did so without having inspected or having any knowledge of the list of convictions on Baumanis' operator's license which, if she had seen it, would have informed her of two convictions (not shown on the abstract of his driving record) in the Village of Solvay on May 7, 1970 for speeding and running a stop sign. An inquiry or investigation concerning these convictions—had the clerk been aware of them—would have revealed that the convictions stemmed from an incident which involved drinking and that the original charge against Baumanis had been driving while intoxicated (Vehicle and Traffic Law, § 1192, subd 2). Further, the driving permit was issued without requiring any written or oral affirmation by the applicant concerning his complete driving record and, indeed, without any effort to ascertain from him whether there had been violations other than those shown on the abstract of his driving record. No instruction to obtain such information had

been given to the issuing clerk. Had Baumanis been required to supply such information, the clerk would have discovered (in addition to the May 7, 1970 violations listed as convictions on his driver's license) the conviction for driving while intoxicated in the Town of Onondaga on August 22, 1973.[2]

No procedure or guideline had been established and no instruction had been issued requiring that issuing clerks obtain what would appear to be the most essential and significant single item of information in any determination concerning an applicant's qualifications for the DWI Counter-Attack Program—the complete up-to-date record of all traffic offenses, particularly those involving the use of alcohol.

Further, I do not agree with the majority that those charged with administering and implementing the experiment had complied with the directives contained in the legislation authorizing the DWI Counter-Attack Program pertaining to selection of participants, referral of persons for participation in the program, and the establishment of criteria for the selection of participants (Vehicle and Traffic Law, §§ 520, 521, 522 as those sections were in effect on August 31, 1973).

Section 521 (subd 1, par [c]) of the Vehicle and Traffic Law provided: "(c) *No person shall be permitted* to participate officially in any such program unless such person has been referred for participation by the driver rehabilitation advisory board, provided further, however, that the commissioner, in his discretion, may reject any person referred for any such program." (Emphasis supplied.)

Section 522 of the Vehicle and Traffic Law provided: "1. The commissioner shall appoint a driver rehabilitation advisory board consisting of not less than five nor more than nine members who shall serve throughout the duration of the driver rehabilitation program or for a term of two years, whichever is less. *The membership of such board shall in-*

---

2. Arguably such inquiry would also have revealed another charge of driving while intoxicated (Vehicle and Traffic Law, § 1192, subd 2) against Baumanis pending in the Town of Clay arising out of an incident on November 28, 1971. The arrest record, which was received in evidence, indicates that Baumanis had driven his car into a ditch, that he needed assistance in walking, and that the breathalyzer test showed an extremely high reading (.31%). The exhibit was received in evidence over objection as showing what the State could have discovered on inquiry concerning Baumanis' record. Although it has relevance and the exhibit was not stricken from the record, it appears from the decision that the trial court did not consider the August 28, 1971 arrest.

*clude, but need not be limited to, representatives of the fields
of education, psychology, sociology, law enforcement and high-
way safety.* The commissioner shall select a chairman, who
shall serve as such for a period of one year. Members of the
board, when performing the work of the board, shall be
compensated at the rate of seventy-five dollars per day and
shall be allowed their actual and necessary expenses incurred
in the performance of their duties. The board will meet at the
call of the chairman, and at such other times as the commis-
sioner may direct.

"2. The board *shall* * * * (c) establish criteria, subject to the
approval of the commissioner, for the selection of those per-
sons to be referred to the commissioner for official participa-
tion in the driver rehabilitation programs authorized by subdi-
vision one of section five. hundred twenty-one of this chapter;
(d) based on criteria developed by the board, select on an
impartial basis those persons to be referred to the commis-
sioner for official participation in such driver rehabilitation
program." (Emphasis supplied.)

While it may be, as the majority assume, that the Legisla-
ture did not intend that the Driver Rehabilitation Advisory
Board personally select each participant, it is evident that the
board is charged with the responsibility of establishing (not
merely approving) the criteria for selecting participants (Vehi-
cle and Traffic Law, § 522, subd 2, par [c]) and of administer-
ing the actual process of selecting the participants (Vehicle
and Traffic Law, § 521, subd 1, par [c]; § 522, subd 2, par [d]).
From the mandatory language in the applicable sections and
from the requirement that the board must include representa-
tives of specifically enumerated fields (education, psychology,
sociology, law enforcement and highway safety) it is apparent
that the Legislature intended the board members to use their
specialized expertise and experience in the formulation of
carefully drawn and thoughtfully considered selection criteria
and, at the very least, that they be deeply and actively
involved in the actual selection process. It appears, however,
that the Outline of Operations for the DWI Counter-Attack
Program was prepared not by the board but by one Eleanor
Ann Garrett in the Albany office of the Department of Motor
Vehicles in co-operation with a Senior Driver Improvement
Analyst, Brian Ginett, who testified that he did not know
whether the outline of operations had been approved by the

Driver Rehabilitation Advisory Board.[3] Further, instead of formulating carefully considered criteria and procedures designed to discover and exclude the chronic alcoholic, the repeated violator, and the dangerous risks, the department adopted a broadly inclusive policy of admitting to the experiment virtually "everyone who is convicted by one of the participating courts for a drinking and driving charge or [whose license] has been revoked for refusal of a chemical test." A policy of wholesale admission can hardly be considered as criteria for selection. I cannot agree, therefore, with the majority's view that participants admitted pursuant to this broad policy "may be viewed as having been 'referred' by the board" after being selected "based on criteria developed by the board" (Vehicle and Traffic Law, § 522, subd 2, par [d]).

There is, in my opinion, overwhelming evidence that it was because of the State's failure to establish proper screening procedures that a high-risk habitual offender who should have been kept off the highways was permitted to drive. Because of his chronic drinking problem and the State's failure to detect it, the accident happened—a consequence that was not only foreseeable but the very harm to be anticipated in assuming the risk of permitting Baumanis to drive. (Cf. *Granger v State of New York,* 14 AD2d 645.) Absent any determination that the findings of the Court of Claims were incorrect or contrary to the weight of the evidence, its decision should not be disturbed *(McCrink v City of New York,* 296 NY 99, 106, *supra; Warren v New York State Thruway Auth.,* 51 AD2d 680).

The judgments should be affirmed.

MOULE, J. P., DENMAN and WITMER, JJ., concur with DILLON, J.; HANCOCK, JR., J., dissents in an opinion.

Judgments reversed and claims dismissed, without costs.

---

**3.** The clerk who issued the interim permit to Baumanis, Margaret Cordon, testified that she had never heard of the Driver Rehabilitation Advisory Board.