72 N.Y.2d 212 (1988)
Jorge Arteaga, Appellant,
v.
State of New York, Respondent.
Michael Treacy, Appellant,
v.
State of New York, Respondent.
Court of Appeals of the State of New York.
Argued April 26, 1988.
Decided June 9, 1988.
John D. Charles and David C. Leven for appellants.
Robert Abrams, Attorney-General (Peter H. Schiff, O. Peter Sherwood and Vernon Stuart of counsel), for respondent.
Judges KAYE, ALEXANDER and TITONE concur with Judge HANCOCK, JR.; Judge SIMONS dissents and votes to reverse in a separate opinion in which Chief Judge WACHTLER and Judge BELLACOSA concur.
*214 HANCOCK, JR., J.
Claimants, inmates in a State correctional facility, seek damages from the State for unlawful confinement and loss of privileges resulting from the prosecution of disciplinary charges against them. Their appeals from an order affirming the dismissal of their claims present a common issue: whether the State is immune from liability for the actions of employees of the Department of Correctional Services in commencing and conducting formal disciplinary proceedings. We hold that where, as here, the employees act under the authority of and in full compliance with the governing statutes and regulations (Correction Law §§ 112, 137; 7 NYCRR parts 250-254), their actions constitute discretionary conduct of a quasi-judicial nature for which the State has absolute immunity (see, Tarter v State of New York, 68 N.Y.2d 511; Tango v Tulevech, 61 N.Y.2d 34).

I
On February 13, 1985, claimant Arteaga was confined to a cell and charged in a misbehavior report with conspiracy to escape from the Great Meadow Correctional Facility and with possession of a weapon found in the soap factory warehouse where he worked. Following a timely Superintendent's hearing, the Hearing Officer found Arteaga guilty and imposed a punishment of 90 days in the special housing unit or in keeplock status and the loss of certain privileges. It appears from the record that the charge was based, in part, on a statement of a confidential informant made to the officer who filed the misbehavior report. On administrative appeal, the Department of Correctional Services reversed for lack of substantiating evidence and the proceeding against claimant *215 Arteaga was terminated. For reasons of safety and to preserve the "viability" of the informant, his testimony was not presented on the appeal.
Claimant Treacy, while an inmate at Great Meadow on October 13, 1983, was charged with possession of escape paraphernalia and contraband. He was confined to his cell pending a Superintendent's hearing after which he was found guilty, given 180 days in special housing and deprived of six months' good behavior allowance. It appears that the misbehavior report was based in part on escape paraphernalia found in the prerelease room where Treacy worked and on information from a confidential informant who had identified claimant from a photograph as an inmate involved in an escape plan. The Department Review Board affirmed the Superintendent's disposition on administrative appeal. Subsequently, after claimant Treacy commenced a CPLR article 78 proceeding challenging the determination, the Commissioner reversed the disposition administratively, restored claimant's good behavior allowance, and expunged references to the charge from his records.
After the dismissal of the proceedings against them, claimants  contending that the sanctions imposed had been unlawful  commenced separate damage actions in the Court of Claims pleading causes of action for malicious prosecution, false imprisonment, and violation of statutory rights. Claimant Treacy also included a cause of action for negligent investigation. The Arteaga court dismissed that action on motion as barred by the doctrine of sovereign immunity. In Treacy, the court granted a dismissal but did so without addressing the question of immunity (131 Misc 2d 849). It found no legal basis for any of the causes of action because of claimant's status as an inmate and the fact that his confinement followed a Superintendent's hearing held in accordance with departmental regulations. In a consolidated appeal, the Appellate Division unanimously affirmed, adverting to the broad discretion vested by the Legislature in the Department of Correctional Services in the disciplining of inmates and holding that such activity is not one "with regard to which the State has waived its sovereign immunity" (125 AD2d 916, 917). We granted leave to appeal and now affirm for the reasons which follow.

II
With the enactment of the Court of Claims Act § 8, the *216 State waived that immunity which it had enjoyed solely by reason of its sovereign character (see, Weiss v Fote, 7 N.Y.2d 579, 585-586; Bernardine v City of New York, 294 N.Y. 361). While assuming liability under the rules applicable to corporations and individuals for the actions of its officers and employees in the everyday operations of government (see, e.g., Wingerter v State of New York, 79 AD2d 817, affd 58 N.Y.2d 848; McCrink v City of New York, 296 N.Y. 99; Bernardine v City of New York, supra), the State retained its immunity for those governmental actions requiring expert judgment or the exercise of discretion (see, Friedman v State of New York, 67 N.Y.2d 271; Weiss v Fote, supra). This immunity, we have held, is absolute when the action involves the conscious exercise of discretion of a judicial or quasi-judicial nature (see, Tarter v State of New York, 68 N.Y.2d 511, supra; Tango v Tulevech, 61 N.Y.2d 34, supra).
The absolute immunity for quasi-judicial discretionary actions is founded on public policy and is generally said to reflect the value judgment that the public interest in having officials free to exercise their discretion unhampered by the fear of retaliatory lawsuits outweighs the benefits to be had from imposing liability (see, Rottkamp v Young, 21 AD2d 373, 376, affd 15 N.Y.2d 831; Gregoire v Biddle, 177 F.2d 579 [2d Cir], cert denied 339 US 949; 2 Harper and James, Law of Torts § 29.10, at 1641). Not all discretionary actions, however, are accorded absolute immunity (see, Tarter v State of New York, supra, at 519).
Whether an action receives only qualified immunity, shielding the government except when there is bad faith or the action taken is without a reasonable basis (see, e.g., Friedman v State of New York, supra, at 283-285; Southworth v State of New York, 62 AD2d 731, affd 47 N.Y.2d 874; Weiss v Fote, supra, at 585, 587; Ufnal v Cattaraugus County, 93 AD2d 521, 524-525) or absolute immunity, where reasonableness or bad faith is irrelevant (see, Tango v Tulevech, supra, at 42), requires an analysis of the functions and duties of the particular governmental official or employee whose conduct is in issue (see, Tarter v State of New York, supra, at 518-519). The question depends not so much on the importance of the actor's position or its title as on the scope of the delegated discretion and whether the position entails making decisions of a judicial nature  i.e., decisions requiring the application of governing rules to particular facts, an "exercise of reasoned judgment which could typically produce different acceptable results" *217 (Tango v Tulevech, supra, at 41; see, Tarter v State of New York, supra, at 518-519).
Thus, in Tarter, in evaluating the functions of the Board of Parole under Executive Law article 12-B, we concluded that parole release decisions were "classically judicial" in nature and deserving of full immunity (68 NY2d, supra, at 518). Similarly, we have held that the discretionary action of a county probation officer in making a judgment concerning custody of a child (Tango v Tulevech, supra), the acts of correction officials and parole supervisors in establishing the level of restrictions on and the degree of supervision for a released inmate (Eiseman v State of New York, 70 N.Y.2d 175, 184), and the decision of a building inspector in refusing to grant a building permit (Rottkamp v Young, 15 N.Y.2d 831, supra) sufficiently evinced the attributes of judicial decision making to merit full immunity (see also, Santangelo v State of New York, 101 AD2d 20, 28-29 [determination of the Temporary Release Committee and the Superintendent of correctional facility granting a weekend furlough warranted quasi-judicial immunity]; Schanbarger v Kellogg, 35 AD2d 902, appeal dismissed 29 N.Y.2d 649, cert denied 405 US 919 [District Attorney's action in prosecuting crime entitled to quasi-judicial immunity]).[1]
We next consider the application of these principles to the correction officers involved in the investigation and prosecution of the charges against claimants.

III
To carry out the "formidable tasks" of maintaining order and security in correctional facilities and protecting the safety of inmates and employees, the Legislature has granted the Commissioner of Correctional Services broad discretion in the formulation and implementation of policies relating to security and to the disciplining of inmates (Matter of Rivera v Smith, 63 N.Y.2d 501, 513). Pursuant to this grant of authority *218 (Correction Law §§ 112, 137), the Commissioner has adopted detailed Procedures for Implementing Standards of Inmate Behavior (7 NYCRR parts 250-254) which include rules and regulations pertaining specifically to the filing and content of reports of misbehavior (§§ 251-1.4, 251-3.1), confinement of inmates (§ 251-1.6), requirements for timely hearings (§ 251-5.1), the designation of authorized Hearing Officers (§ 253.1), and procedures for conducting Superintendent's hearings (part 254). There is no question that the officers and employees responsible for filing the misbehavior reports against claimants, conducting the hearings, and confining them before and after the hearing determinations acted entirely within their authority and in compliance with the applicable rules and regulations. The question is whether their actions involved the exercise of discretion of a quasi-judicial nature.
In filing a report of misbehavior (§ 251-1.4), confining an inmate to his cell or housing area when there are reasonable grounds to believe that the inmate represents an immediate threat to the safety, security, or order of the facility (§ 251-1.6), and in conducting hearings, the officers and employees of the department are enjoined, as they are with any disciplinary action, to follow the general policies on discipline of inmates (§ 250.2). These statements of policy express the general departmental philosophy on discipline and include basic guidelines and directives to the effect that disciplinary action must not be overly severe (§ 250.2 [e]), must be administered "in a completely fair, impersonal and impartial manner" (§ 250.2 [d]), be appropriately varied to fit such factors as the particular circumstances involved, the behavior pattern of the inmate and the present atmosphere of the facility (§ 250.2 [b] [1], [2], [3]), and must be taken only to the extent necessary to regulate an inmate's behavior within acceptable limits (§ 250.2 [c] [1]) and to "assist in achieving compliance by the entire inmate population with required standards of behavior" (§ 250.2 [c] [2]). In these departmental rules and regulations (7 NYCRR parts 250-254), it is evident that the Commissioner has made an extensive delegation of his statutory authority relating to security, discipline, and inmate behavior to the employees and officers present in the facilities. It is to them that the day-by-day responsibility for such matters is entrusted.
Because of the problems of maintaining security and discipline within correctional facilities, the discretion delegated to the employees and officers is necessarily comprehensive and *219 calls for the exercise of judgment under widely varying conditions. What, if any, disciplinary action to take in a given situation is a matter requiring consideration of broad policies and general objectives in the application of the governing rules and regulations to the particular circumstances. Where some correction officers might think it necessary to confine an inmate, others, because they considered the infraction to be less serious or evaluated the inmate's behavior pattern differently, could reasonably conclude otherwise. Similarly, what some Hearing Officers might regard as barely enough proof to warrant a finding of guilt in a Superintendent's hearing, others might reasonably reject as insufficient.
Like the decisions of the Board of Parole in Tarter v State of New York (supra), and of the probation officer in Tango v Tulevech (supra), the actions of Correction Department employees in preparing and filing misbehavior reports, confining inmates, and making dispositions following Superintendents' hearings entail discretionary decisions in furtherance of general policies and purposes where the exercise of reasoned judgment can produce different acceptable results (see, Tango v Tulevech, supra, at 41). We conclude, then, that actions of correction employees, in circumstances such as those here, are quasi-judicial in nature and deserving of absolute immunity. In carrying out their duties relating to security and discipline in the difficult and sometimes highly stressful prison environment, correction employees, like other officials with quasi-judicial responsibilities, should not be inhibited because their conduct could be the basis of a damage claim (see, Tarter v State of New York, supra, at 518; Butz v Economou, 438 US 478, 514).
We cannot accept the view of the dissent that actions of correction officers "are comparable to the actions of police officers, who under established law are entitled only to qualified immunity." (Dissenting opn, at 222.) The duties of police officers and the correction officers involved here are not comparable in the nature of their functions, their role in society, or in the underlying policy considerations. Correction officers, unlike police officers, are responsible "for the safety, security and control of correctional facilities" (Correction Law § 137 [2]) in the tense environment of prisons, where proper discipline is essential for the maintenance of order and control. In determining whether there are reasonable grounds to believe that an inmate represents an immediate threat to the safety, security or order of the facility (7 NYCRR 251-1.6) and that *220 they should, therefore, confine the inmate for up to three days, correction officers fulfill a role that is in a sense judicial. In investigating, preparing, and reviewing reports of misbehavior, weighing evidence, and deciding whether to institute disciplinary proceedings (7 NYCRR 251-1.4, 251-2.2) they perform duties which are essentially prosecutorial.
Because of the unquestioned risks to inmates, employees, and the public from a breakdown in order and discipline in correctional facilities and the potentially tragic consequences of such occurrences (see, Jones v State of New York, 33 N.Y.2d 275, 280), it is particularly important that correction officers not be dissuaded by the possibility of litigation from making the difficult decisions which their duties demand. Nor should correction personnel acting as reviewing officers feel reluctant to reverse hearing determinations because doing so might expose the State to liability. These policy considerations dictate the need for quasi-judicial immunity for correction officers who must maintain control and security in the closed setting of a correctional facility where inmates are involuntarily confined by decree of the State. These same considerations do not exist for police officers who ordinarily have neither the duty nor the authority to exert control or discipline over the people in society at large, where the right of the individual to be free from unwarranted police regulation and interference is fundamental.[2]
There is no basis for the contention that giving full immunity to the conduct of correction employees in taking authorized disciplinary measures will deprive inmates of all rights to recover damages against the State in the Court of Claims (Correction Law § 24 [2]) for unlawful actions of employees taken beyond their authority or in violation of the governing rules and regulations (see, Riviello v Waldron, 47 N.Y.2d 297, 303; Cepeda v Coughlin, 128 AD2d 995, 996, 997; see also, *221 Della Pietra v State of New York, 71 N.Y.2d 792). Thus, actions of correction personnel in physically abusing inmates (see, Correction Law § 137 [5]) or in confining them without granting a hearing or other required due process safeguard (see, 7 NYCRR 251-5.1; parts 252-254) would not receive immunity (cf., Wilkinson v Skinner, 34 N.Y.2d 53 [cause of action stated where an inmate was maliciously placed in segregated confinement without any hearing and in violation of his constitutional rights]). In addition, although inmates are precluded by statute from suing Correction Department employees in their personal capacity in State courts (see, Correction Law § 24 [1]; Cepeda v Coughlin, supra), they may, contrary to claimants' assertion, bring actions in Federal court pursuant to 42 USC § 1983 where correction officers have violated their constitutional rights (see, Redding v Fairman, 717 F.2d 1105 [7th Cir], cert denied 465 US 1025; Chavis v Rowe, 643 F.2d 1281 [7th Cir], cert denied sub nom. Boles v Chavis, 454 US 907; Mary & Crystal v Ramsden, 635 F.2d 590 [7th Cir]; cf., Freeman v Rideout, 808 F.2d 949 [2d Cir]).
Accordingly, the order of the Appellate Division should be affirmed.
SIMONS, J. (dissenting).
The inmate claimants before the court were kept in punitive confinement by correction officials, for 107 and 120 days respectively, on charges of misconduct which were subsequently dismissed. They allege that the charges against them were trumped up, that they were the victims of intentional and malicious wrongs by State employees. The issue before the court is whether, assuming their claims are true, they may recover money damages for the wrongs done them. The majority hold that they may not, that correction officials are absolutely immune from tort liability for such wrongs.
Although I agree that the Hearing Officers are entitled to absolute immunity for common-law torts, I do not agree that the correction officers who investigate inmate misbehavior and institute disciplinary proceeding by preparing and filing misconduct reports are similarly immune. The protection afforded Hearing Officers may be warranted because of the quasi-judicial nature of their duties but there is little to commend a rule of law that insulates the State and its investigative officials from liability for damage caused by deliberate wrong-doing. Nor is there any need to establish absolute immunity in this case for correction officers enjoy the benefits of a unique *222 statute protecting them against personal liability for their wrongs (see, Correction Law § 24). In my view, the officers' actions are comparable to the actions of police officers, who under established law are entitled only to qualified immunity. Accordingly, I dissent and I would reverse the order of the Appellate Division and reinstate the claims seeking to hold the State vicariously liable for the actions of the investigating correction officers.

I
Under traditional legal doctrine, the State is not liable for torts committed in its service by officers or employees unless it consents to such liability. New York waived its sovereign immunity by enacting section 8 of the Court of Claims Act and consented to have its liability determined generally in accordance with the same rules of law that apply against individuals and corporations (see, Jones v State of New York, 33 N.Y.2d 275, rearg dismissed 55 N.Y.2d 878). Nevertheless, not all conduct by public officials is actionable; the State may assert that claims against it are barred because the acts of its servants are immune from suit notwithstanding its waiver of sovereign immunity generally. The defense of immunity is available to public officers and employees charged with making decisions and of acting in accordance with them so that they will not be unduly hampered in the discharge of their duties. It is recognized, as a matter of policy, because the operations of government would be impeded if those who act improperly or exceed the authority given them were not protected in some reasonable degree by being relieved from private liability. The basis of the immunity has been not so much a desire to protect an erring officer as it has been a recognized need to preserve independence of action, undeterred by the fear of personal liability and vexatious suits, which could substantially impair the effective performance of a discretionary function.
New York has granted immunity more broadly than most jurisdictions, drawing the line generally between discretionary acts which are immune from suit and ministerial acts, which are not (see, Rottkamp v Young, 15 N.Y.2d 831, 833 [dissenting opn of Burke, J.]). The distinction is an unfortunate one, derived from the old rules governing injunctions and prerogative writs (see, 5 Harper, James and Gray, Torts § 29.10, at 668-669 [2d ed]). Under those rules, the court avoided interfering *223 with discretionary acts of the executive branch of government but would entertain proceedings involving ministerial functions of executive officers. That rule has little bearing in tort claims but unfortunately it has been the source of much New York law, oversimplifying the analysis to one of affixing the appropriate label on the officials' actions rather than examining the factors upon which a sound policy decision can be made. Immunity should be based on such factors as (1) the function the officer is performing, (2) the extent to which review of that judgment will involve the court in passing judgment on a coordinate branch of government, (3) the extent to which judicial review will impair free exercise of discretion, (4) the extent to which ultimate financial responsibility will fall on the officer, (5) the likelihood that harm will result to members of the public if the action is taken, (6) the nature and seriousness of the harm which may result and (7) the availability of other remedies to the injured party (see, Restatement [Second] of Torts § 895D, comment f). Under this analysis, even if the act is considered "discretionary", and therefore entitled to some protection, the immunity extended may properly be limited as a matter of sound public policy.
An official receiving absolute immunity is not liable to another, regardless of his motives and whether or not he tried to exercise his judgment in good faith, so long as he acts within the general scope of his authority (cf., Della Pietra v State of New York, 71 N.Y.2d 792). Typical is the rule shielding a Judge from liability no matter how erroneously, corruptly, or maliciously he is alleged to have acted (see, Sweeney v O'Dwyer, 197 N.Y. 499, 504; Lange v Benedict, 73 N.Y. 12, 25; Pierson v Ray, 386 US 547; and see, Tarter v State of New York, 68 N.Y.2d 511, 518). The immunity is granted because of the Judge's neutral position and the need to insure absolute independence in judicial office. We have extended this protection to administrative officials and others performing quasi-judicial duties if they are truly "neutrally positioned government officials" (Tarter v State of New York, 68 N.Y.2d 511, 518, supra).
As our opinion in Tarter made clear, however, not "every official act involving discretion will be considered a judicial function conferring absolute immunity" (id., at 519). Qualified, not absolute, immunity is the norm and the burden rests on the official seeking absolute freedom from liability to demonstrate that public policy requires an exemption of that scope *224 (Cleavinger v Saxner, 474 US 193, 201; Harlow v Fitzgerald, 457 US 800, 807).
The Supreme Court considered what immunity should be afforded prison officials for wrongs arising from disciplinary proceedings in Cleavinger v Saxner (474 US 193, 203-204, supra; see also, Procunier v Navarette, 434 US 555) and held that they were entitled to only qualified immunity in actions seeking damages for violations of an inmate's constitutional rights. Even in claims against Hearing Officers it found them entitled to no more than limited protection because they are not neutral and independent adjudicatory officers but prison employees temporarily diverted from their regular duties and amenable to prison administrators and staff. Despite this authority I concur with the majority's conclusion that, for purposes of common-law tort actions in New York, prison Hearing Officers should be entitled to absolute immunity because they perform a function that is adjudicatory in the broad sense of the term and they do so under conditions of extreme intimacy and tension which require that they be insulated from harassment by inmates. I would but add that granting full immunity under State law does not eliminate all avenues of relief because inmates may maintain an action in the Federal courts for the unconstitutional actions of Hearing Officers (see, Cleavinger v Saxner, supra).[1]
The function of the correction officers who investigate and prefer charges differs substantially from those of the Hearing Officers, however, and analysis is not aided by the conclusory assertion that their work also requires the use of discretion. As we noted in Tango v Tulevech, "almost any act admits some discretion in the manner of performance, even driving a nail" (61 N.Y.2d 34, 41, quoting Prosser, Torts § 132, at 990 [4th ed]; and see, Restatement [Second] of Torts § 895D, comment h [ministerial acts  including care of prisoners as a ministerial act]). The task is to identify those functions which the courts are willing to recognize as entitled to the protection afforded by absolute immunity. As the Second Circuit Court of Appeals observed when deciding that police officers who make arrests and conduct searches are not entitled to absolute immunity, "the real question to be asked is whether or not federal *225 officers performing police duties warrant the protection of the [absolute] immunity defense" (Bivens v Six Unknown Named Agents, 456 F.2d 1339, 1346). The question is one of policy for while "it is true that a police officer must exercise some discretion in making an arrest, the fiction that this act is not discretionary is maintained because of the belief that the benefit to society derived from the protection of personal liberties outweighs the detriment of perhaps deterring vigorous police action" (id). The Bivens court resolved the policy question against absolute immunity.
New York has treated police officers similarly, even under our broader immunity rules. Our decision in Jones v State of New York (supra) recites State law fully consistent with Bivens. In Jones we held by a divided court that the State could be held liable vicariously for the acts of an agent who intentionally assaulted claimant's decedent during the effort to retake the Attica Correctional Facility after the 1971 uprising. The two opinions cite extensive authority for the proposition that the State and its municipalities may be held liable for actions of its police officers (see, Jones v State of New York, supra). Indeed the dissent recognized the historical "destruction of immunity for police torts" (id., at 282), but believed that the State was immune because the claim challenged a policy decision of the executive branch of government, how to regain control of the facility after the uprising, not an action by an individual police officer. Observing that it is difficult to define with precision what is a discretionary function for immunity purposes, the dissent noted that it would have found no immunity if Jones were "a simple police tort case" (id., at 286). And this was so notwithstanding the role of discretion, perhaps a high degree of discretion, in effecting an arrest (id., at 285; see, Bivens v Six Unknown Named Agents, 456 F.2d 1339, 1346, supra; Jaffe, Suits against Governments and Officers: Damage Actions, 77 Harv L Rev 209, 218-219). Thus, all seven members of the Jones court agreed that if a police officer commits an intentional tort during an arrest situation, similar to the allegations here, the law does not recognize the conduct as a discretionary act entitled to absolute immunity. A majority of the court also applied that rule to officers acting in the explosive setting which surrounded the retaking of Attica Prison.
Thus, these officials who investigate and file disciplinary charges performed a function analogous to police officers making an arrest or conducting a search or in retaking the *226 prison in Jones and they should receive no greater protection than the qualified immunity applicable to police officers under Federal law (see, 42 USC § 1983; Bivens v Six Unknown Fed. Narcotics Agents, 403 US 388; Pierson v Ray, 386 US 547, 555-557) or, in the context of a State tort action for false arrest or other intentional tort, the corresponding defense of privilege, shielding the officer from liability for objectively reasonable but mistaken exercises of judgment (see, Broughton v State of New York, 37 N.Y.2d 451, 457-458; Smith v County of Nassau, 34 N.Y.2d 18, 23-24; see also, Pierson v Ray, 386 US 547, 555-557, supra).[2] Indeed, even if it be urged, as the majority does, that the investigation functions of the correction officers are more analogous to similar functions performed by prosecutorial officials they would be entitled to no more than limited protection (see, Drake v City of Rochester, 96 Misc 2d 86, 100-101, affd 74 AD2d 996; cf., Imbler v Pachtman, 424 US 409).
Nor do I find that the decisions the majority cites support its claim that investigating officers are entitled to absolute immunity. It relies principally on Eiseman v State of New York (70 N.Y.2d 175, 184); Tarter v State of New York (supra) and Tango v Tulevech (supra). Those decisions are distinguishable on two grounds: first because they involve attempts to hold officers liable for quasi-judicial acts and under established law the investigation and arrest of offenders by the police are not quasi-judicial acts and second, because they were negligence claims not claims for intentional tort as alleged here. Moreover, the "need", in the policy sense, for immunity was greater in those cases because the officials did not take the direct action which caused the plaintiffs' injuries themselves; they created only a risk of harm. The actual injury was caused by a third party. In effect, the doctrine of immunity was used to define the scope of duty owed to members of the general public (see, Crosland v New York City Tr. Auth., 68 N.Y.2d 165, 170; see, Prosser and Keeton, Torts § 132, at 1062-1063 [5th ed]). Moreover, the majority's reliance on Schanbarger v Kellogg (35 AD2d 902, appeal dismissed 29 N.Y.2d 649, lv denied 29 N.Y.2d 485, cert denied 405 US 919) is erroneous, for in Schanbarger the police officer making the initial arrest was held liable for the tort of false imprisonment (Schanbarger v Kellogg, 37 N.Y.2d 451, cert denied 423 US 929).
*227 The majority finds that "the problems of maintaining security and discipline within correctional facilities" (majority opn, at 218) requires affording all correction personnel absolute immunity. Correction officials undoubtedly confront unique problems but several reasons indicate that qualified immunity or the common-law defense of privilege provides the desired balance, permitting prison officials to perform their tasks effectively and recognizing the right of inmates to be free from harm maliciously inflicted by prison personnel.
First, misconduct by prison officials presents a potential for harm which may not be deterred or subject to redress unless inmates have a common-law remedy. This is so because prison disciplinary proceedings may be commenced with the filing of an inmate misbehavior report any time an employee suspects but is not reasonably sure that an inmate was involved in an incident (7 NYCRR 251-1.4 [d]). A correction officer may place an inmate in punitive confinement when the officer has reasonable grounds to believe that there is an immediate threat to the safety, or order of the facility or in an immediate danger to other persons or to property (7 NYCRR 251-1.6). Thus, inmates may be confined for 14 days, or longer upon approval of the Commissioner's designee, on the sole authority of the officer preparing the misbehavior report before guilt or innocence is resolved or before any judicial or quasi-judicial assessment of its validity is made. These powers may easily be abused with little risk of public scrutiny because, unlike police stations and courtrooms, the public and press have little access to prisons.
Second, inmates have no adequate remedy other than an action for damages. Notwithstanding the majority's statements about liability generally, its holding results in barring these claimants from relief in both State and Federal courts and the majority does not claim otherwise. Correction Law § 24 (1) prevents an inmate from suing a correction officer in his personal capacity in State court for either State common-law or constitutional violations (see, Cepeda v Coughlin, 128 AD2d 995, lv denied 70 N.Y.2d 602). But more importantly, a recent ruling of the Second Circuit Court of Appeals holds that an inmate has no constitutional claim for being falsely or wrongly accused of conduct that has resulted in a deprivation of a constitutionally protected liberty interest by being placed in a special housing unit or solitary confinement provided the inmate is afforded with the minimum requirements of due *228 process required for prison disciplinary matters (Freeman v Rideout, 808 F.2d 949). Thus, inmates such as these, who do not claim that they have been denied procedural due process but allege that they have been wrongfully and maliciously placed in punitive confinement, have no forum, either State or Federal, to seek money damages to redress the wrong. That we may disagree with the Second Circuit is little comfort to New York prisoners. Under current law, we will never be able to address the question because Correction Law § 24 (1) prevents an inmate from bringing a section 1983 action against a correction officer in State court.
Moreover, the majority's ruling is not necessary to achieve the underlying purpose of the official immunity doctrine. These prison officials will not be exposed to financial liability, even if qualified immunity is the rule, because Correction Law § 24 (1) provides them with even greater protection than other public officials receive. It does more than indemnify the official against personal liability; it forecloses inmate suits against the officers completely (cf., Public Officers Law §§ 17, 18). At best, the action could be maintained against the State for vicarious liability and now the majority has foreclosed even that avenue of relief.
The majority contends that notwithstanding the lack of a tort remedy, administrative review and article 78 relief inhibit unlawful and malicious actions by prison officials. These remedies offer no realistic deterrent to correction officers acting in bad faith, however, and little solace to inmates who have already served their sentence in special housing. The officer may still confine inmates until resolution of the pending charges and even if the charges are dismissed by the prison Hearing Officer or the courts, the inmate is the worse for the experience, not the correction officer.
In sum, and applying the criteria listed above (dissenting opn, at 222), the correction officers are performing what is essentially a police function, one which the courts routinely review, and the availability of relief against the State will not inhibit them in the performance of those duties or result in financial risk because of statutory protection afforded to them. But most important the absence of a remedy, under these circumstances which permit extraordinary opportunities for abuse because of the broad powers given the officers and the lack of public oversight mandate that some remedy be available to these claimants and others similarly situated and the *229 majority's decision ensures that none is. The common-law doctrine of privilege, which is the functional equivalent of qualified immunity as used in Federal decisions (Pierson v Ray, 386 US 547, 555, supra; Prosser and Keeton, Torts § 131, at 1032 [5th ed]; Restatement [Second] of Torts § 895D, comment e) adequately protects the State's interest without foreclosing all avenues of relief for wrongful confinement and it should be available here. Applying that doctrine to the cases before us, claimants have stated a cause of action and their claims should not have been dismissed.

II
On this appeal claimants have confined their arguments to the causes of action alleging malicious prosecution and false imprisonment.
Whether an administrative hearing is a "judicial proceeding", and therefore will support a cause of action for malicious prosecution, appears to be an open question in this court although other courts have considered the subject (see, e.g., Groat v Town Bd., 73 AD2d 426, and cases cited therein; Gittens v State of New York, 132 Misc 2d 399; Treacy v State of New York, 131 Misc 2d 849). The question need not be resolved in this dissenting opinion, however, for claimants have stated a valid cause of action in the nature of false imprisonment or, as one court has termed it in the prison context, "wrongful excessive confinement" (see, Gittens v State of New York, supra, at 407). For that reason, if no other, their claims should not have been dismissed.
Claimants have alleged that the State intended to confine them, that they were conscious of the confinement and did not consent to it and that the confinement was not privileged. Those allegations sufficiently plead a claim for damages arising from false imprisonment (Broughton v State of New York, 37 N.Y.2d 451, supra, citing Restatement [Second] of Torts § 35). The only element of the cause of action in doubt is the element of privilege. The majority's analysis implicitly concludes that a correction officer's actions in confining an inmate to a special housing unit is privileged simply because the party bringing suit is an inmate, an individual whose freedom of movement is already restrained to a significant degree, and because the State provides procedural due process to the inmates. An inmate has a constitutionally protected liberty interest to remain in the general prison population, however, *230 by virtue of New York's statutes and regulations (see, Deane v Dunbar, 777 F.2d 871) and even though this may not be actionable in a 1983 action in Federal court, inmates should have a common-law remedy to protect this liberty interest (compare, Freeman v Rideout, 808 F.2d 949, supra, with opns of Oakes and Newman, JJ., dissenting from denial of petition for rehearing en banc 826 F.2d 194). Claimants have alleged that they were intentionally and maliciously placed in punitive segregation for no legitimate reason. We held years ago, in Wilkinson v Skinner (34 N.Y.2d 53), that such allegations state a cause of action which if proved will entitle an inmate to recover damages attributable to the segregation but the majority neither distinguishes nor expressly overrules that decision.
I perceive no policy reasons why such a remedy should be foreclosed. Certainly, requiring the courts to pass on the merits of an inmate's claim of wrongful punitive confinement will not impose a crushing burden upon the State, nor should it inhibit prison officials in the proper performance of their duties. Public officials currently enjoy complete freedom from personal liability for acts performed in the performance of their duties (Correction Law § 24 [1]; Cepeda v Coughlin, 128 AD2d 995, supra) and the rule of qualified immunity, insulating the State from liability for the reasonable acts of correction officials performed in the exercise of their duties provides the State with ample protection.
Accordingly, I dissent.
Order affirmed, without costs.
NOTES
[1] Schanbarger v Kellogg (37 N.Y.2d 451, cited in the dissenting opn, at 226) and Jones v State of New York (33 N.Y.2d 275, cited in the dissenting opn, at 225) both deal with actions of police officers. Because the claims based on police misconduct involve different considerations and are not analogous to claims based on the actions of correction officers, neither Schanbarger nor Jones is in point. We have cited a different Schanbarger decision (35 AD2d 902) simply for the proposition that both the Assistant District Attorney and the medical examiner were performing quasi-judicial functions and, as such, entitled to absolute immunity.
[2] Despite the dissent's attempts to distinguish our decisions in Eiseman, Tarter, and Tango (see, dissenting opn, at 226), it does not suggest that our decision is inconsistent with the general rule stated in Tango v Tulevech: that "discretionary or quasi-judicial acts involve the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result" (61 N.Y.2d 34, 41). In addition, the dissent's statement that these cases are not controlling because they involved negligence claims (dissenting opn, at 226), fails to recognize that Tarter v State of New York restated the well-settled principle that absolute immunity protects quasi-judicial decisions even when tainted by improper motives or malice (68 N.Y.2d 511, 518; Murray v Brancato, 290 N.Y. 52, 55).
[1] The same would not be true for an action against the investigative officers under the facts in these cases because under the law existing in the Second Circuit the investigative officials did not deprive claimants of their constitutional due process rights (see, Freeman v Rideout, 808 F.2d 949, reh denied 826 F.2d 194, cert denied ___ US ___, 108 S Ct 1273).
[2] For a general discussion of immunity and privilege and the confusion in terms in this area, see, Restatement (Second) of Torts § 895D, comment e; Prosser and Keeton, Torts §§ 131, 132, at 1032-1033, 1043-1051, 1056-1069 (5th ed).